# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
**ENTERED**

**MAR 5 - 2002**

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| SCOTT MAYO, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-01-2139 |
| | § | |
| HARTFORD LIFE INSURANCE | § | |
| CO., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

The parties in this case dispute the validity of corporate-owned life insurance policies purchased by employers on the lives of their employees and former employees. Plaintiffs are Texas citizens suing as representatives of a putative class of individuals, and estates of individuals, who worked for Defendant Camelot Music, Inc. ("Camelot") and Trans World Entertainment Corporation ("Trans World") (collectively, the "Camelot Defendants") and Wal-Mart Stores, Inc. ("Wal-Mart"). These companies, collectively referred to as the "Employer Defendants," are named in this action as representatives of a putative class of employers who purchased corporate-owned life insurance policies ("COLI policies") insuring the lives of Texas citizens. The Employer Defendants purchased these life insurance policies from various insurance companies, including Hartford Life Insurance Company ("Hartford") and AIG Life Insurance Company ("AIG").

The Court has before it several pending motions. The Camelot Defendants move to dismiss Plaintiffs' claims in their entirety.[1] The Camelot Defendants also move for summary

---

[1]   *See* Motion of Defendants Camelot Music, Inc. and Trans World Entertainment Corp. to Dismiss Complaint [Doc. # 15] ("Camelot Defendants' Motion to Dismiss"). The Camelot Defendants have also moved to dismiss the Second Amended Complaint, *see* Motion of
(continued...)

judgment.[2]  Plaintiffs have cross-moved for partial summary judgment against the Camelot

Defendants.[3]  Defendant Wal-Mart moves for summary judgment on the claims against it.[4]

---

[1]   (...continued)
Defendants Camelot Music, Inc. and Trans World Entertainment Corp. to Dismiss the
Second Amended Class Action Complaint [Doc. # 36], and incorporate by reference the
arguments they make in their first motion to dismiss. Defendants also filed a Memorandum
of Defendants Camelot Music Inc., and Trans World Entertainment Corp. in Support of
Motion to Dismiss Complaint [Doc. # 16] ("Camelot Memorandum"). Plaintiffs responded.
*See* Camelot Plaintiffs' Response to Camelot's Motion to Dismiss [Doc. # 28]. Defendants
replied.  *See* Reply of Defendants Camelot Music and Trans World Entertainment
Corporation in Further Support of Motion to Dismiss Complaint [Doc. # 37].  Plaintiffs
submitted a sur-reply. *See* Camelot Plaintiffs' Sur-Reply to Camelot's Motion to Dismiss
[Doc. # 41].

[2]   *See* Motion of Defendants' Camelot Music, Inc and Trans World Entertainment Corporation
for Summary Judgment [Doc. # 30] ("Camelot Defendants' Summary Judgment Motion").
Plaintiffs responded to this motion.  *See* Plaintiffs' Response to Camelot's Motion for
Summary Judgment [Doc. # 33]. The Camelot Defendants replied. *See* Reply of Defendants
Camelot Music, Inc. and Trans World Entertainment Corporation in Further Support of
Motion for Summary Judgment [Doc. # 45]. Plaintiffs submitted a sur-reply. *See* Plaintiffs
Sur-Reply concerning Camelot Music, Inc. and Trans World Entertainment Corporation's
Motion for Summary Judgment [Doc. # 50]. In this latter submission, Plaintiffs address
issues raised in several pending motions. The Court will refer to this generally as "Plaintiff's
November 2, 2001 Submission."

[3]   *See* Camelot Plaintiffs' Motion for Partial Summary Judgment [Doc. # 17] ("Camelot
Plaintiffs' Summary Judgment Motion"). Defendants responded in opposition. *See* Hartford
Life Insurance Company's Response to Camelot Plaintiffs' Motion for Partial Summary
Judgment [Doc. # 39]; Response of Defendants Camelot Music, Inc., and Trans World
Entertainment Corporation to Camelot Plaintiffs' Motion for Partial Summary Judgment
[Doc. # 40]. Plaintiffs replied. *See* Camelot Plaintiffs' Reply Concerning Their Motion for
Partial Summary Judgment [Doc. # 50]. Defendants submitted sur-replies. *See* Sur-Reply
of Defendants Camelot Music, Inc. and Trans World Entertainment Corporation in
Opposition to Camelot Plaintiffs' Motion for Partial Summary Judgment [Doc. # 54];
Hartford Life Insurance Company's Sur-Reply to Camelot Plaintiffs' Motion for Partial
Summary Judgment and Objections to the Declaration of Seth J. Chandler [Doc. # 55].

[4]   *See* Defendant Wal-Mart's Motion for Summary Judgment and Brief in Support [Doc. # 19]
("Wal-Mart's Summary Judgment Motion"). Wal-Mart also submitted supporting
documents.  *See* Exhibits in Support of Defendant Wal-Mart's Motion for Summary
Judgment [Doc. # 20] ("Wal-Mart's Exhibits"); Supplemental Exhibits in Support of
Defendant Wal-Mart's Motion for Summary Judgment and Brief in Support (Pages Omitted
from Original Exhibits 2 and 3) [Doc. # 31]; Supplemental Exhibits in Support of Defendant
(continued...)

The Wachovia Bank of Georgia, N.A. ("Wachovia"), as trustee for Defendant Wal-Mart Stores, Inc. Corporation Grantor Trust ("Wal-Mart Trust"), seeks summary judgment in its favor.[5] Defendant Hartford also moves for summary judgment,[6] and Defendant AIG moves to dismiss and for summary judgment.[7] Finally, Wal-Mart objected to evidence submitted

---

[4]  (...continued)
Wal-Mart's Motion for Summary Judgment and Brief in Support [Doc. # 44] ("Wal-Mart's Supplemental Exhibits"); Notice of Additional Authority in Support of the Motions for Summary Judgment of Wal-Mart Stores, Inc. and Wal-Mart Stores, Inc. Corporation Grantor Trust [Doc. # 66]; Affidavit of Tom Emerick [Doc. # 23] ("Emerick Aff."); Supplemental Affidavit of Tom Emerick [Doc. # 49] ("Supplemental Emerick Aff."). Plaintiffs responded. *See* The Estate of Douglas Sims' Response to Wal-Mart's Motion for Summary Judgment [Doc. # 32]. Wal-Mart replied. *See* Defendant Wal-Mart's Reply to the Estate of Douglas Sims' Response to Wal-Mart's Motion for Summary Judgment [Doc. # 43]. Plaintiffs submitted a sur-reply. *See* Plaintiffs' Sur-Reply Concerning Wal-Mart's Stores, Inc.'s Motion for Summary Judgment [Doc. # 50]. Plaintiffs also contend that summary judgment is improper since discovery is necessary to determine if genuine fact questions exist. *See* Declaration of Scott M. Clearman in Support of Request for Denial or Continuance of Summary Judgment (Fed. R. Civ. P. 56(f)), ¶¶ 30-36 ("Clearman Decl."). This Rule 56(f) motion is denied as moot.

[5]  *See* Motion for Summary Judgment of Defendant Wal-Mart Stores, Inc. Corporation Grantor Trust, Through its Trustee, the Wachovia Bank of Georgia, N.A. [Doc. # 58] ("Wal-Mart Trust's Summary Judgment Motion"). Plaintiffs submitted Plaintiffs' Response to Wal-Mart Stores, Inc. Corporation Grantor Trust's Motion for Summary Judgment [Doc. # 62].

[6]  *See* Hartford Life Insurance Company's Motion for Summary Judgment [Doc. # 24] ("Hartford's Summary Judgment Motion"). Plaintiffs responded in opposition. *See* Camelot Plaintiffs' Response to Hartford's Motion for Summary Judgment [Doc. # 33]. Hartford replied in support of its motion. *See* Hartford Life Insurance Company's Reply in Support of Motion for Summary Judgment [Doc. # 45] ("Hartford's Reply"). Plaintiffs submitted a sur-reply. *See* Plaintiffs' Sur-Reply Concerning Hartford Life Insurance Company's Motion for Summary Judgment [Doc. # 50].

[7]  *See* Defendant AIG Life Insurance Company's Motion to Dismiss and Memorandum in Support Thereof [Doc. # 59] ("AIG's Motion to Dismiss"); Defendant AIG Life Insurance Company's Motion and Memorandum in Support of Summary Judgment on Plaintiffs' Second Amended Complaint [Doc. # 60] ("AIG's Summary Judgment Motion"). Plaintiffs submitted the following in opposition to these motions: The Estate of Douglas Sims' Response to AIG Life Insurance Company's Motion to Dismiss [Doc. # 64] ("Sims Estate's Response to AIG's Motion to Dismiss") and The Estate of Douglas Sims' Response to AIG Life Insurance Company's Motion for Summary Judgment [Doc. # 65]. AIG replied. *See* (continued...)

by Plaintiffs.[8]  All motions are ripe for adjudication.  The Court heard argument on these motions on September 7, 2001 and January 11, 2002.[9]  The parties submitted supplemental materials after the January 11 Hearing.[10]

Having considered the parties' submissions, the record, and the applicable authorities, the Court grants some of the motions and denies others, as set forth specifically below.

## I.   **BACKGROUND FACTS**

This case is an uncertified class action that involves a dispute over the rights to

---

[7]   (...continued)
Defendant AIG Life Insurance Company's Reply in Further Support of its Motion to Dismiss the Second Amended Complaint [Doc. # 73] ("AIG's Reply in Support of its Motion to Dismiss"); Defendant AIG Life Insurance Company's Reply in Further Support of Its Motion for Summary Judgment on the Second Amended Complaint [Doc. # 72].

[8]   *See* Defendant Wal-Mart's Objections to Declaration of Seth J. Chandler [Doc. # 56]. These objections are denied as moot. The Court has not considered the Declaration in its rulings.

[9]   *See* Transcript of Proceedings of Scheduling Conference, September 7, 2001  [Doc. # 26] ("Sept. 7, 2001 Transcript"); Transcript of Hearing, January 11, 2002 [Doc. # 88] ("Jan. 11, 2002 Transcript").

[10]  *See* Letter of Scott Clearman (Plaintiffs' attorney) to Judge Atlas (Jan. 15, 2002) [no Doc. #]; Affidavit of Christine Hayer Repasy [Doc. # 76] ("Repasy Aff."); Supplemental Memorandum in Further Support of Motion to Dismiss the Complaint by Defendants Camelot Music, Inc. and Trans Word Entertainment Corporation [Doc. # 78] ("Camelot Defendants' Supplement"); Wal-Mart's Supplemental Brief in Support of Motions for Summary Judgment [Doc. # 79]; Second Supplement Affidavit of Tom Emerick [Doc. # 80] ("Second Supp. Emerick Aff."); Plaintiffs' Motion to Strike, Response to Wal-Mart's Supplemental Brief in Support of Motions for Summary Judgment, Supplemental Motion for Continuance and Leave to Depose Tom Emerick [Doc. # 85]; Plaintiffs' Response to Camelot's and Hartford's Submissions Concerning Policy Loans, Motion for Continuance and Leave to Depose Christine Repasy or, in the Alternative, to Strike Her Affidavit [Doc. # 86]; Response of Defendants Camelot Music, Inc. and Trans World Entertainment Corporation to Camelot Plaintiffs' Motion for a Continuance Pursuant to FRCP 56(f) [Doc. # 87]; Wal-Mart's Response in Opposition to Plaintiffs' Motion to Strike, Plaintiffs' Response to Wal-Mart's Supplemental Brief in Support of Motion for Summary Judgment, and Plaintiffs' Supplemental Motion for Continuance and Leave to Depose Tom Emerick [Doc. # 89]; Hartford Life Insurance Company's Opposition to Plaintiffs' Motion for Continuance and Leave to Depose Christine Repasy or to Strike in her Affidavit [Doc. # 90]; Reply by Estate of Douglas Sims in Support of its Motion to Strike Wal-Mart's Supplemental Brief [Doc. # 91].

benefits from company-owned life insurance policies. Plaintiffs Scott Mayo, Toribio Rochas, Jr., Tomas Pena, Daniel Garza, and Charles W. Holmes, Jr. are Texas citizens who were employees of Defendant Camelot (collectively, sometimes referred to as the "Camelot Plaintiffs"). Another Plaintiff is the Estate of Douglas Sims ("Sims Estate"), which is represented in this action by Deborah Sims, the independent executrix of the Sims Estate and a Texas citizen. Douglas Sims was a Texas citizen who worked for Defendant Wal-Mart until his death on December 1, 1998.

Defendant Camelot was a Pennsylvania corporation. It was acquired in December 1997 by Defendant Trans World, a New York corporation with its principal place of business in New York. Defendant Wal-Mart is a Delaware corporation with its principal place of business in Arkansas. Defendant Wal-Mart Trust was established by Wal-Mart in Georgia and is represented in this action by its trustee, Defendant Wachovia, a bank apparently "located" in Georgia.[11] Defendant Hartford is a Connecticut insurance company with its principal place of business in Connecticut. Defendant AIG is a Delaware insurance company with its principal place of business in Delaware.

Camelot employed the Camelot Plaintiffs during the 1980s and 1990s. All Camelot Plaintiffs ceased their employment with Camelot by 1998. Wal-Mart employed Douglas Sims from 1987 until his death in December 1998.

The subject of this case is the validity of COLI policies, insurance policies purchased and owned by the Employer Defendants on the lives of their employees. These policies list the employers as the sole beneficiaries. As explained by Hartford, the employers borrowed money from the insurers to pay the COLI policy premiums.[12] The employers claimed the

---

[11]   *See, e.g.,* Affidavit of Raymond H. Sapp ("Sapp. Aff.") (Exhibit B to Wal-Mart's Exhibits), at 1, ¶ 1. Wachovia's citizenship (state of incorporation or principal place of business) is not definitively established in the record.

[12]   Sept. 7, 2001 Transcript, at 11-13. Hartford submitted the Repasy Affidavit, which provides additional details on the policy loan arrangement between Hartford and the Camelot Defendants. Repasy attests that the surrender value of the Camelot COLI policies will be reduced by "*any loan balance*" outstanding on the policy. Repasy Aff., ¶ 3; Sept. 7, 2001
(continued...)

interest paid on these loans as tax deductions. The employer also earned non-taxable interest through the COLI policies. Upon the death of an employee, the employer would use the death benefit from the policy to repay the premium loans. The Internal Revenue Service ("IRS") disputes Defendants Camelot and Wal-Mart's deductions and the tax implications of the COLI policies.[13]

On February 16, 1990, Camelot purchased from Mutual Benefit Life Insurance Company ("Mutual")[14] COLI policies on the lives of all of its employees who worked more than twenty hours per week.[15] Camelot and/or Trans World is the beneficiary of these

---

[12]    (...continued)
Transcript, at 11-13. Plaintiffs move to strike this affidavit as untimely and improper expert testimony. *See* Plaintiffs Response to Camelot's and Hartford's Submissions Concerning Policy Loans, Motion for Continuance and Leave to Depose Christine Repasy or, in the Alternative, to Strike her Affidavit [Doc. # 86]. This motion is denied. The Repasy Affidavit is not improper expert testimony; it merely presents the factual framework of the Camelot COLI policy loans and the calculations under the contracts of the policy's surrender value.

[13]    Sept. 7, 2001 Transcript, at 7-8, 40-41.

[14]    Mutual was one of the major underwriters of COLI policies. Van Etten Aff., ¶ 6. Hartford acquired Mutual's COLI line of business in November 1992. *Id.*

[15]    The fact that there are COLI policies on the lives of the Camelot Plaintiffs is not disputed. The Camelot Defendants admit that they are the "sole owner and beneficiary" of COLI policies on the Camelot Plaintiffs' lives. Camelot Memorandum, at 4. Hartford has submitted the Repasy Aff., to describe the terms of the Camelot COLI policy regarding the effect that outstanding loans have on the policy and the policy's surrender value. Repasy Aff., ¶¶ 1-3. However, the specific terms and conditions of the policies are less certain. While no party has provided the Court with authenticated copies of the actual COLI policies on the Camelot Plaintiffs, a sample policy is attached to the Complaint. *See* Plaintiffs' Second Amended Class Action Complaint [Doc. # 29] ("Complaint"). Plaintiffs allege that Exhibit A to the Complaint is a COLI policy that Camelot purchased from Mutual. *Id.* The pages in Exhibit A are not consecutively numbered, but bear Bates stamped nos. "DE-CMH00457" through "DE-CMH00491." Exhibit A does not name any Camelot Plaintiff as the insured, but appears to be a specimen policy. *See* Exhibit A, at DE-CMH00457; *id.* at DE-CMH00489 "Statement of Policy Cost and Benefit Information." Exhibit A refers to the name of insured in the application pages to "Schedule A," *id.* at DE-CMH00488, which appears to refer to Exhibit B to the Complaint, titled "Camelot Enterprises, Inc. MB211 Schedule A Insured Name Sequence," which shows only the names of the Camelot Plaintiffs, and is a redacted list of Camelot employees insured under the COLI policies.

policies. Plaintiffs allege that Camelot purchased the policies in secret and did not request permission from its employees. The policies remain in effect.[16] Counsel for Camelot, however, represented to the Court that there was a "very real" possibility that Camelot would surrender the policies. This decision was contingent on the resolution of a tax case concerning the policies.[17]

On or about December 28, 1993, Wal-Mart bought COLI policies from Hartford and AIG on the lives of its employees, including Douglas Sims.[18] Like Camelot, Wal-Mart was to receive the proceeds of the policies.[19] Plaintiffs allege that Wal-Mart purchased these policies in secret and that Douglas Sims never consented to the purchase.[20] Wal-Mart asserts that it paid a portion, between $5,000 and $10,000 for current employees, of the proceeds of

---

[16]     Sept. 7, 2001 Transcript, at 7-8.

[17]     *Id.* Counsel for Hartford stated that the policies continue to be subject to "tremendous indebtedness" by the Employer Defendants. *Id.* at 11-12. The Camelot Defendants describe the loan arrangement regarding their COLI policies in their supplemental submission. *See* Camelot Defendants' Supplement, at 1-3; *see also* Repasy Aff., ¶ 3. As described *supra*, an Employer Defendant borrowed from the COLI policy issuer, an Insurer Defendant, to pay the COLI policy premiums.

[18]     *See* Emerick Aff., ¶¶ 7-10, and Exhibit 10; Sapp Aff., Exhibits 13 and 14. The COLI policy on Sims's life (policy no. 147539) was issued by AIG and has a face amount of $64,504. *See* Emerick Affidavit, Exhibit 10 ("Sims COLI Policy" or "Sims Policy"), at 3. The owner of the policy is listed as "Wachovia Bank of Georgia, N.A., as Trustee of the Wal-Mart Stores, Inc. Corporation Grantor Trust." *Id.* The Sims Policy refers to another document, the AIG Letter of Understanding (Exhibit 12 to Sapp Aff.), which is incorporated into the Sims Policy by reference, and contains terms *inter alia* regarding fees and costs of the COLI policies as well as projections regarding the growth of the value of the Policy. *See* Exhibit C to the AIG Letter of Understanding. Nothing in the AIG Letter of Understanding indicates that the purpose or function of the COLI policy was to fund the Wal-Mart employee benefit plan.

[19]     Emerick Aff., ¶¶ 5, 10. Wal-Mart has submitted affidavits that state that the proceeds of the COLI policies were paid to the Wal-Mart Trust, which remitted the funds to Wal-Mart. Emerick Aff., ¶ 10.

[20]     This allegation is disputed by Wal-Mart, based on notice it allegedly gave to all employees.

the COLI policies to the estates of its deceased employees as a Special Death Benefit.[21]  The Special Death Benefit was never paid to the Sims Estate because Wal-Mart discontinued that benefit before Sims's death.[22]  Wal-Mart represented to the Court that it had surrendered all its COLI policies in January 2000.[23]

It is undisputed that the Insurer Defendants developed and marketed the COLI policies to employers.[24]  Plaintiffs contend that the COLI policies were a tax avoidance scheme that was challenged by IRS.[25]  On the other hand, Defendants contend that the COLI policies were used to fund employee benefit plans.[26]

## II.    THE PARTIES' BASIC CONTENTIONS

Plaintiffs' essential contention is that the COLI policies are contrary to Texas public policy because the Employer Defendants do not have an "insurable interest" in their lives.

Plaintiffs seek to certify two classes.  First, they request certification of a plaintiff class that consists of:

> All Texas citizens (or if deceased, the Texas citizen's estate) whose lives are or were insured under a COLI policy issued by AIG Life Insurance Company, Mutual Benefit Life Insurance Company or Hartford Life Insurance Company that purportedly named an employer or former employer as the policy's beneficiary or owner, excluding those who are current officers of the named

---

[21]    Emerick Aff., ¶¶ 4-5.

[22]    *Id.*, ¶¶ 6-7.

[23]    Sept. 7, 2001 Transcript, at 6.

[24]    Affidavit of James Van Etten, ¶¶ 5-6 (Attachment A to Appendix for Hartford's Summary Judgment Motion) ("Van Etten Aff.")  James Van Etten is an Assistant Vice President of Hartford.  *Id.*, ¶ 1.  He assisted with the development of the COLI policies at Hartford and at Mutual Benefit Life Insurance Company, and managed the COLI polices for Defendants Camelot and Wal-Mart.  *Id.*, ¶¶ 2-5.

[25]    Defendant Hartford concedes that the COLI policies provided tax advantages to the corporations that purchased them.  Van Etten Aff., ¶ 6; Sept. 7, 2001 Transcript, at 11-13.  Counsel for Defendants Camelot and Wal-Mart admit that their clients are currently in dispute with the IRS over the COLI polices.  Sept. 7, 2001 Transcript, at 7-8, 40-41.

[26]    Van Etten Aff., ¶¶ 5-6; Emerick Aff., ¶ 5; Camelot Memorandum, at 4.

policy beneficiary or owner (or if deceased, those who were officers of the policy beneficiary at their death) and those who designated the policy's beneficiary.

Complaint, at 11.  Second, Plaintiffs request certification of a Employer Defendant class of:

[C]ompanies that bought insurance policies written by AIG Life Insurance Company, Mutual Benefit Life Insurance Company or Hartford Life Insurance Company, that insure or insured the lives of Texas employees other than corporate officers and name the company as beneficiary or owner.

*Id*.  Plaintiffs have not yet moved for class certification.

Plaintiffs seek the benefits of the COLI policies.  Specifically, Plaintiffs request a declaration, under 28 U.S.C. § 2201, that (i) the Employer Defendants do not now have and never have had an "insurable interest" in the lives of their employees, as insurable interests are defined by Texas law, (ii) that the Employer Defendants are not the lawful owners of the COLI polices, and (iii) that Plaintiff employees are the "lawful owners" of the COLI policies, with all rights of the "owner" as defined in the policies.  Plaintiffs seek a final judgment "providing remedies necessary to give the declarations force and effect," which Plaintiffs define as a final judgment (i) placing the polices and all benefits from the policies in a constructive trust for the benefit of Plaintiffs, (ii) awarding "money identifying the amount held in constructive trust by members of the defendant-employer class for the benefit of the plaintiffs and members of the plaintiff-insured person class"; and (iii) disgorging the "money unjustly had and received by members of the defendant-employer class through the [COLI] policies in issue."  Complaint, at 12-13.

Defendants assert numerous defenses to Plaintiffs' claims.  First, Defendants contend that Plaintiffs' claims are founded upon Texas law, but Georgia law governs this case and Plaintiffs cannot state a cause of action under Georgia law.  Defendant Wal-Mart contends that Plaintiffs' claims are preempted by Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").  Defendant AIG contends that the claims of Plaintiff Sims Estate are time-barred since the COLI policy sold to Wal-Mart on Sims's life was created in December 1993 and Wal-Mart gave Sims notice of the existence of the insurance at about that time.  Defendant AIG also argues that the Sims Estate has failed to state a claim under

the insurable interest doctrine and moves to dismiss these claims. The Camelot Defendants contend that the Camelot Plaintiffs' claims are not ripe, since these Plaintiffs all are still living, and their causes of action accrue only when the death benefits under the COLI policies are payable. Finally, the Camelot Defendants contend that the Camelot Plaintiffs' claims are not legally viable because the Texas insurable interest doctrine does not provide a remedy to living insureds and does not allow reformation of the insurance contract. Each of these matters will be addressed in turn.

## III.  APPLICABLE LEGAL STANDARDS

The parties have filed numerous motions to dismiss and motions for summary judgment. The Court notified the parties at the January 11, 2002 conference that if documents or other evidence outside of the pleadings had been submitted in connection with a motion to dismiss, the Court intended to convert the motion, if appropriate, to a motion for summary judgment. *See* FED. R. CIV. P. 12(b). The Court therefore permitted the parties to make additional submissions.

### A.  Standard for Motions to Dismiss

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 365 (5th Cir. 2000). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565, 573 (5th Cir. 2001). The district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Southern Christian Leadership Conf. v. Supreme Court of Louisiana*, 252 F.3d 781, 786 (5th Cir. 2001). Thus, the Court must determine whether the complaint states any valid claim for relief in the light most favorable to the plaintiff and with every doubt resolved in the plaintiff's behalf. *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). Furthermore, a plaintiff must plead specific facts, not mere conclusory allegations or unwarranted deductions of fact, in order to avoid dismissal for

failure to state a claim. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498, (5th Cir. 2000).

### B. Summary Judgment Standard

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*); *Bozé v. Branstetter*, 912 F.2d 801, 804 (5th Cir. 1990). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The facts are to be reviewed with all "justifiable inferences" drawn in favor of the party opposing the motion. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy – that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith*, 158 F.3d at 911.

The burden then shifts to the nonmovant to demonstrate that summary judgment is inappropriate. *See Morris,* 144 F.3d at 380. This is accomplished by producing "significant probative evidence" that there is an issue of material fact so as to warrant a trial, *see Texas Manufactured Hous. Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996); *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 161 (5th Cir. 1996); *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), and that is "sufficient to support a jury verdict." *Morris,* 144 F.3d at 380; *Doe v.*

*Dallas Indep. School Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). This burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *E.g., Morris*, 144 F.3d at 380. Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* Dispute about a material fact is genuine only if evidence is such that reasonable a jury could return a verdict for nonmoving party. *Stafford v. True Temper Sports*, 123 F.3d 291, 294 (5th Cir. 1997); *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir. 1992).

In the absence of any proof, the Court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995); *Little*, 37 F.3d at 1075. Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little*, 37 F.3d at 1075.

## C.   Texas Insurable Interest Doctrine

"[I]t is against the public policy of the State of Texas to allow anyone who has no insurable interest to be the owner of a policy of insurance upon the life of a human being." *Griffin v. McCoach*, 123 F.2d 550, 551 (5th Cir. 1941); *accord, DeLeon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344, 350 (5th Cir. 2001); *Cheeves v. Anders*, 28 S.W. 274, 275 (1894); *Tamez v. Certain Underwriters at Lloyd's, London, International Accident Facilities*, 999 S.W.2d 12, 16-17 (Tex. App.–Houston [14th Dist.] 1999, pet. denied). Put another way, the "State of Texas has established a fixed policy with reference to its own citizens, by and through which it refuses to permit one who has no insurable interest in a living person to be and become the beneficiary in an insurance policy written on the life of such living person." *Cole v. Browning*, 187 S.W.2d 588, 593 (Tex. Civ. App.–Ft. Worth 1945, writ ref'd w.o.m.) (citing *Cheeves v. Anders*, 28 S.W.

274 (1894)). The doctrine has been defined more specifically to provide that a "putative beneficiary only has an insurable interest in the life of another where the beneficiary is '(1) so closely related by blood or affinity that he wants the other to continue to live, irrespective of the monetary considerations; (2) a creditor; [or] (3) one possessing a reasonable expectation of pecuniary benefit or advantage from the continued life of another.'" *Tamez*, 999 S.W.2d at 17 (quoting *Drane v. Jefferson Standard Life Ins. Co.*, 139 Tex. 101, 161 S.W.2d 1057, 1058-59 (1942)); *Stillwagoner v. Travelers Ins. Co.*, 979 S.W.2d 354, 360-61 (Tex. App.–Tyler 1998, no pet.)); *DeLeon*, 259 F.3d at 350.

Since the mid-1950's, by Texas statute, TEX. INS. CODE, art. 3.49-1, §§ 2-3, an individual may designate his own beneficiary – even if that beneficiary otherwise lacks an insurable interest under common law. Texas law also allows an employer to obtain death benefit from "key-man" life insurance on a crucial employee. *See Tamez*, 999 S.W.2d at 18 n.4 (citing TEX. INS. CODE, art. 3.49).[27]

## IV.   CHOICE OF LAW

### A.   Overview

Defendants all raise a threshold choice of law issue.[28]  The jurisdiction of this Court is based on diversity of citizenship.  28 U.S.C. §1332.[29]  Defendants argue that Georgia law – which Defendants contend does not recognize Plaintiffs' causes of action – governs this dispute.  In response, Plaintiffs argue that Texas state courts would apply the

---

[27]   Defendants contend that Georgia's insurable interest law contrasts with the Texas doctrine in various ways. Georgia gives employers an insurable interest in the lives of their employees. GA. CODE ANN. § 33-24-3 (1990) ("A corporation has an insurable interest . . . in the life . . . of any of its directors, officers, or employees . . . or any other person whose death . . . might cause financial loss to the corporation.")

[28]   *See* Camelot Defendants' Summary Judgment Motion; Defendant Wal-Mart's Motion for Summary Judgment; Motion for Summary Judgment of Defendant Wal-Mart Stores, Inc. Corporation Grantor Trust, Through its Trustee, the Wachovia Bank of Georgia, N.A.; Hartford's Summary Judgment Motion; AIG's Summary Judgment Motion.

[29]   Defendant Wal-Mart asserts complete ERISA preemption, and relies on federal question jurisdiction under 28 U.S.C. § 1331. The ERISA contentions are addressed *infra* in Section V.

Texas common law insurable interest doctrine to COLI policies on the lives of Texas citizens.

Relevant to this choice of law issue is the place where the COLI policy transactions occurred. Defendants Camelot and Wal-Mart contend that their COLI policy transactions are centered in the state of Georgia. The Camelot Defendants claim that they intended to situate their COLI policies in Georgia, and intended for Georgia law to apply. According to James Van Etten, a Vice President of Hartford, Camelot's COLI policies were issued in Georgia and were administered by a third party administrator in that state.[30] Other than these conclusory assertions, the Camelot Defendants have offered no evidence to support this contention. Plaintiffs have submitted materials from a tax case related to the Camelot COLI policies. Camelot's insurance broker testified in that proceeding that the COLI policies had closer ties to Ohio then Georgia.[31] Plaintiffs also have provided evidence that some activity related to the administration of the COLI

---

[30]   Van Etten Aff., ¶ 8.

[31]   During trial in the tax case, styled *IRS v. CM Holdings, Inc.*, No. 97-695 (D. Del. 2000), James Campisi, Camelot's insurance broker, testified regarding Camelot's decision on where to locate the COLI policies. Campisi stated: "In terms of notification, consent and insurable interest, Georgia and Ohio were pretty similar," but the company selected Georgia because it had more favorable premium tax laws. *IRS v. CM Holdings, Inc.*, Trial Transcript, at 1204-06 (Exhibit B of Appendix to Camelot Plaintiffs' Motion for Summary Judgment). However, Campisi also testified that the Camelot COLI policies in fact had significant contacts to Ohio:

> [T]he application and the prepayment agreement was signed in Ohio. The first check that was written came from Ohio. That would indicate that the policies were issued in Ohio. The policies were physically delivered to Ohio. And that would indicate that the policies were delivered – were issued in Ohio.

*Id.* Ultimately, Campisi concluded that the COLI policies were issued in Ohio, but Georgia law applied for premium tax purposes. *Id.*

policies occurred in Texas, since death certificates were obtained in Texas when insureds who died were Texas residents.[32]

Wal-Mart submits evidence that it established the Wal-Mart Trust, which was created in Georgia to own the COLI policies, to forward funds to pay policy premiums to the insurers, and to transmit policy proceeds to Wal-Mart.[33] Wal-Mart further asserts that it applied for and received the policies in Georgia and intended the policies to be governed by Georgia law.[34]

Defendants strenuously contend that the resolution of the choice of law issue is strictly determined by the Texas conflict of law rules relating to contract actions.[35] However, Plaintiffs are not signatories to the COLI policies. Plaintiffs do *not* claim that Defendants are liable for breaching the terms of those contracts. Plaintiffs do not seek to enforce rights under the terms of the COLI policy contracts as written. Plaintiffs did not participate in the negotiation for the contracts. Plaintiffs did not receive or give definitive consideration for their involvement in the contracts.[36] Thus, Plaintiffs' role is not the ordinary participant in the formation of a contract and Plaintiffs' causes of action do not fit the typical breach of contract rubric. Rather, Plaintiffs' claims arise under the Texas

---

[32] *Id.*, at 1094-97.

[33] Emerick Aff., ¶ 8.

[34] *Id.* ¶ 5.

[35] For example, Defendant Hartford argues that "[b]ecause life insurance policies are contracts, the Court should apply the choice of law principles that govern contractual disputes." Hartford's Summary Judgment Motion, at 8. Defendant Wal-Mart argues that the principles of the Restatement (Second) of Conflicts of Laws § 188(2) – the section dealing with contract disputes – should be applied "when deciding which state's law should govern the construction of contractual rights." Wal-Mart's Summary Judgment Motion [Doc. # 19], at 11.

[36] Wal-Mart contends that it gave its employees a Special Death Benefit in connection with those employees' participation in the Wal-Mart Employee benefits plan. The Special Death Benefit was offered solely in Wal-Mart's discretion, and was a contingent right that in fact was cancelled by Wal-Mart several years later. The Court does not decide if this benefit constitutes consideration to the employee, as opposed to a gift from Wal-Mart.

common law insurable interest doctrine with equitable remedies sought under unjust enrichment principles.

The parties have cited and the Court is aware of no Texas authority that employs contract choice of law principles in an action that involves purely the insurable interest doctrine. This case accordingly raises a choice of law issue of first impression.

The decision as to what state's law will apply must be made for each disputed claim separately. It is possible that the state whose law applies to the COLI policies in a dispute between the signatories to the policy contract may differ from the state whose law applies to issues regarding a non-signatory's claim about the absence of an insurable interest. Ultimately, the relevant question is whether a Texas court would apply Texas or Georgia law on insurable interests.

Defendants insist that contract choice of law principles should be applied. Plaintiffs do not supply any probative alternative approach. Since Plaintiffs want to benefit from the insurance contracts, and since contract doctrines are a focus of many the contentions of the parties, the Court concludes that the contract claim choice of law analysis provides an appropriate framework. The Court holds that Texas courts would apply the Texas insurable interest doctrine, even though other disputes concerning these COLI policies may be governed by other states' laws.

## B.    Applicable Contract Choice of Law Principles

In diversity cases, federal courts must apply the conflict of law rules of the state in which they sit. *Klaxon v. Stentor*, 313 U.S. 487, 496 (1941); *Denman v. Snapper Div.*, 131 F.3d 546, 548 (5th Cir. 1998). Accordingly, this Court will apply the conflict of laws principles followed by Texas state courts.[37]

---

[37]    Plaintiffs assert diversity jurisdiction under 28 U.S.C. § 1332. Complaint, at 1. Defendants do not challenge subject matter jurisdiction. The Court is satisfied, from its review of the record, that complete diversity exists and that the amount in controversy for each named Plaintiff exceeds $75,000.

The Texas Supreme Court has adopted the "most significant contacts" test of the Restatement (Second) of Conflicts of Laws § 6 ("Restatement") for determining all choice of law issues.[38] *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420-21 (Tex. 1984); *see also Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735-36 (Tex. 1997); *Maxus Exploration v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991).

The Restatement provides that a court must follow, "subject to constitutional restrictions . . . a statutory directive of its own state on choice of law." RESTATEMENT §6(1); *Maxus Exploration*, 817 S.W.2d at 54. Neither Plaintiffs nor Defendants assert that a statutory directive governs the outcome of the choice of law issue in this case. In the absence of a statutory directive, the Court is to consider the relevant choice of law principles in the Restatement. *Id.*

The Restatement's analysis commences with § 6, which sets forth the pertinent overriding principles:

    (a)    the needs of the interstate and international systems,

    (b)    the relevant policies of the forum,

    (c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

    (d)    the protection of justified expectations,

    (e)    the basic policies underlying the particular field of law,

    (f)    certainty, predictability and uniformity of result, and

    (g)    ease in the determination and application of the law to be applied.

RESTATEMENT § 6(2).

---

[38]    This test does not apply to contract cases in which the parties have a valid choice of law clause in the contract. *Duncan*, 665 S.W.2d at 421. The COLI policies do not contain a choice of law clause. Accordingly, the Court applies the Restatement's fact-based analysis.

In contract cases, Texas courts examine the § 6 principles in light of the parties specific "contacts" or factors listed in Restatement § 188. The pertinent contacts under §188 are:

    (a)    the place of contracting,

    (b)    the place of negotiation of the contract,

    (c)    the place of performance,

    (d)    the location of the subject matter of the contract, and

    (e)    the domicile, residence, nationality, place of incorporation and place of business of the parties.

RESTATEMENT § 188(2); *Minnesota Mining and Mfg. Co.*, 953 S.W.2d at 735-36;*Maxus Exploration*, 817 S.W.2d at 53-54; *Houston Casualty Co. v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 2d 789, 797 (S.D. Tex. 1999). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." RESTATEMENT § 188(2). In general, it is not the number of contacts with a particular state that is determinative. *Duncan*, 665 S.W.2d at 421. "Some contacts are more important than others because they implicate state policies underlying the particular substantive issue." *Id.* Ultimately, the "selection of the applicable law depends on the qualitative nature of the particular contacts." *Id.* Once the facts pertaining to the parties' and the dispute's contacts with various states are established, the Court is to decide the choice of law issue as a matter of law. *Id.*

### C.  Analysis of Restatement § 6 Considerations in Insurable Interest Cases

The Court analyzes the § 6 principles first, and then considers the § 188 contacts in that context. The importance of the § 6 principles is heightened in this case because this case does not fit the typical contract dispute pattern. As explained in Section IV.A., *supra*, Plaintiffs' relationship with Defendants, the actual contracting parties, is unique in that Plaintiffs did not participate in or agree to the creation of the insurance contracts in issue.

1.      **The Relevant Policies of the Forum, Policies of Other Interested States, and the Relative Interests of Those States in the Determination of the Particular Issue**

*Texas Public Policy Generally.* – Texas courts have repeatedly refused to follow the majority rule adopted by other states that allows non-creditors and non-family members to have an insurable interest in another's life. *E.g., DeLeon*, 259 F.3d at 350 (employer did not have insurable interest in employee's life); *Griffin*, 123 F.2d at 551 (assignees of insured's former business partners and life insurance beneficiaries did not have insurable interest); *Drane v. Jefferson Standard Life Ins. Co.*, 139 Tex. 101, 105-06, 161 S.W.2d 1057, 1058-59 (1942) (godson had insurable interest in godmother's life only because godson had a reasonable expectation of pecuniary benefit from godmother, who made frequent and substantial gifts to godson during his lifetime); *Cheeves*, 28 S.W. at 291 (former partner of insured did not have insurable interest after leaving partnership); *Tamez*, 999 S.W.2d at 16-17, 19 (employer did not have insurable interest in employees); *Stillwagoner*, 979 S.W.2d at 360-61 (employer did not have insurable interest in employee); *Cole*, 187 S.W.2d at 593 (former wife did not have insurable interest in former husband). Texas maintains a strong public policy requiring the beneficiary of an insurance contract to have an insurable interest in the life of the insured.

*The* **Griffin** *Cases, Other Insurable Interest Decisions and Texas Public Policy.* – Plaintiffs predominantly argue that the choice of law decision in this case is governed by the opinions of the United States Supreme Court in *Griffin v. McCoach*, 313 U.S. 498, 506 (1941), and the Fifth Circuit on remand in *Griffin v. McCoach*, 123 F.2d 550, 551 (5th Cir. 1941). The Court concludes that the *Griffin* cases do not dispose of the issue presented by Plaintiffs' claims, but the opinions provide valuable insight into the insurable interest doctrine and its importance as law of the State of Texas.

In *Griffin*, the Supreme Court held that Texas courts have the constitutional authority to "refuse enforcement of an insurance contract where the beneficiaries have no insurable interest on the ground of its interference with local law." 313 U.S. at 506. The personal representatives of Gordon, a deceased Texas citizen, disputed the entitlement of

certain beneficiaries of a life insurance policy on Gordon's life.[39] *Id*. at 499-500. The Supreme Court stated:

> It is "rudimentary" that a state "will not lend the aid of its courts to enforce a contract founded upon a foreign law where to do so would be repugnant to good morals, would lead to disturbance and disorganization of the local municipal law, or, in other words, violate the public policy of the state where the enforcement of the foreign contract is sought."

*Id*. at 506 (citation omitted). The court held that it would be constitutionally permissible for a Texas court to refuse the enforcement of a foreign contract that violated local public policy embodied in the Texas insurable interest doctrine. *Id*. at 507. However, the court

---

[39]  In *Griffin*, Gordon's personal representatives filed suit in Texas federal court against the insurance company that issued the life insurance policy. 313 U.S. at 499-500. The insurance company under the federal interpleader statute joined all named beneficiaries under the policy and deposited the policy benefits into a court fund. *Id*. Thereafter, the insurance company was dismissed from the action.

The genesis of the insurance policy on Gordon's life was Gordon's business venture with several New York investors (the "syndicate"). *Id*. As consideration for money lent by the syndicate to Gordon, Gordon agreed to the purchase of a life insurance policy on his life with the syndicate as beneficiary. *Id*. The syndicate paid the policy premiums. *Id*. Later, the individual members of the syndicate were made the beneficiaries. *Id*. At some point, Gordon agreed to release his right to determine the beneficiaries of the policy in exchange for a one-eighth share of the policy proceeds made payable to his wife. *Id*. Thereafter, the members of the syndicate separately assigned their interests to other individuals not involved with the syndicate. *Id*. Most of the actions relevant to obtaining the policy occurred in New York or New Jersey, although Gordon lived in Texas. *Id*. at 501.

The district court found the policy to be a New York contract. *Id*. The district court and the Fifth Circuit held that New York law governed, and that the assignees of the syndicate had insurable interests under New York law. *Id*. at 501-02. Accordingly, both the district court and court of appeals held that the assignees were entitled to receive their shares of the policy benefits. *Id*. at 501-03. The court of appeals, applying federal choice of law principles, held that the application of Texas insurable interest law – under which the assignees did not have an insurable interest – would be an improper extraterritorial application of Texas law to a New York contract. *Id*. at 502-03. In an opinion issued the same day as *Klaxon v. Stentor*, 313 U.S. 487 (1941), the Supreme Court reversed, holding that it would not be unconstitutional for a Texas court to refuse the enforcement of a foreign contract that violated local public policy embodied in the Texas insurable interest doctrine. *Id*. at 506-07. The Supreme Court remanded the case and directed the court of appeals to determine whether a Texas court would apply Texas insurable interest law. *Id*. at 507.

explained that Texas may only apply its public policy to foreign contracts that relate to "anything done or to be done within [its] borders." *Id.* at 507. The Supreme Court in *Griffin* did not decide whether Texas courts would apply the Texas insurable interest doctrine to foreign life insurance contracts on the lives of Texas citizens. *Id* at 504, 507. Instead, the court remanded the issue to the Fifth Circuit. *Id.*

On remand, the Fifth Circuit implicitly concluded that Texas law applied,[40] and interpreted the effect of the Texas insurable interest doctrine on the facts before it. *Griffin*, 123 F.2d at 551. The Fifth Circuit held that Texas law required the insurance proceeds to be paid to the estate of the insured, rather than the contractual beneficiaries' assignees who lacked an insurable interest in the life of the insured under Texas law. The court of appeals gave two reasons for its holding. First, the insurance proceeds were in the custody of the court.[41] *Id.* Second, the court of appeals held that "it is against the public policy of the State of Texas to allow anyone who has no insurable interest to be the owner of a policy of insurance upon the life of a human being." *Id.* The court further stated that it had "no reason to think that courts of Texas would permit citizens of other

---

[40] Defendants argue (somewhat presumptuously) that the Fifth Circuit did not address the choice of law issue, as directed by the Supreme Court. While the court of appeals did not present any analysis, it is clear that the court made a choice of law decision. This Court presumes that the court of appeals followed the directive of the Supreme Court despite the absence of any explicit discussion on the threshold choice of law issue.

[41] The Fifth Circuit does not cite authority to justify this part of its holding. Defendants attempt to distinguish *Griffin* because there are no funds on deposit with this Court (or in any court) for any of the Plaintiffs. Other Texas cases establish, however, that the policy proceeds do not have to be located in Texas for the insurable interest doctrine to apply. The doctrine serves to protect the lives of Texas citizens irrespective of the vagaries of the location of the policy proceeds. *See Cheeves*, 28 S.W. at 275 (holding that the primary justification of insurable interest doctrine was that the public "has an interest that no inducement shall be offered to one man to take the life of another."); *Tamez*, 999 S.W.2d at 15 ("[I]t is against public policy to enforce a contract which makes it in the interest of a person to bring about the death of another.") (citing *Wilke v. Finn*, 39 S.W.2d 836, 838 (Tex. Comm. App. 1931)). It would be anomalous to permit insurers to control the choice of law decision after an insured's death simply by placing the insurance proceeds in a jurisdiction with law contrary to Texas policy.

states to speculate upon the death of one of its citizens by means of contracts made without the state when the same is forbidden within its territorial limits." *Id.*[42]

The *Griffin* decisions accurately reflect Texas precedent on choice of law and policy. For example, a Texas court in *Manhattan Life Ins. Co. v. Cohen*, 139 S.W. 51, 57 (Tex. Civ. App.–San Antonio 1911, writ dism'd), held that an assignment of the beneficial interest in life insurance policies on the life of a Texas citizen to one with no insurable interest was governed by Texas law. The *Cohen* court emphasized the importance of Texas policy by stating that, even if the assignment were governed by, and valid under, another state's law, "it may be doubted whether, on account of its being contrary to the distinctive policy of the forum in which the suit was brought, such laws would be given effect by the courts of Texas." *Id.*

In *Cole v. Browning*, another Texas appellate court held that Texas had a legitimate governmental interest in deciding the rights to an insurance policy's proceeds when the insured died while he and the named beneficiary under the policy were temporarily residing in Texas. 187 S.W.2d 588, 593 (Tex. Civ. App.–Fort Worth 1945, writ ref'd w.o.m.).[43] The court held that a Texas court will apply Texas insurable interest

---

[42] Despite the Supreme Court's holding in *Griffin*, Defendants argue that application of the Texas insurable interest doctrine to Defendants' COLI policies on the lives of Texas citizens is an improper extraterritorial application of Texas law. This argument is rejected. The Supreme Court in *Griffin* held that Texas courts may constitutionally apply the Texas insurable interest doctrine to foreign contracts that insure the lives of Texas citizens. 313 U.S. at 506.

[43] In *Cole*, Ruby Browning was the beneficiary of an insurance policy on the life of her former husband, Bryan Watson Browning, and sought recovery of the policy proceeds after Bryan's death. *Id.* at 590. Both Ruby and Bryan were temporarily in Texas (for independent reasons) at the time Bryan died, having each been there for only a few months. *See id.* at 590, 593. Bryan purchased the policy in Indiana and it was delivered there by the New York insurance carrier. *Id.* at 589. In connection with their divorce, Ruby and Bryan agreed to release all claims against the other and their property. *Id.* at 590. After the divorce, Ruby claimed to be a citizen of Missouri, a jurisdiction in which the law gave her an insurable interest in Bryan's life. *Id.* at 590, 591. The Texas court held that Texas law would apply, since both Ruby and Bryan were living – albeit temporarily – in Texas, a Texas temporary administrator of Bryan's estate had been appointed, the administrator had brought suit and completed
(continued...)

law to all insurance policies relating to persons residing in Texas, even if these individuals are citizens of states with contrary insurable interest law. *Id.* at 594. "A state may prohibit the enjoyment by persons within its borders of rights acquired elsewhere which violate its laws or public policy." *Id.* at 594; *accord Bell v. Phillips*, 152 F.2d 188, 190 (5th Cir. 1946).

   ***The Current Viability of Texas Insurable Interest Doctrine.***– In response to Plaintiffs' *Griffin* arguments, Defendants characterize Texas policies and the insurable interest doctrine as obsolete. These arguments are meritless. For example, Wal-Mart argues that the public policy of Texas is an "old common law rule that has been heavily weakened by statute."[44] Yet, Texas courts have consistently and recently applied the insurable interest doctrine.[45] Further, although Texas courts recognized certain exceptions to the doctrine even before portions of the doctrine and its exceptions were codified in the Texas Insurance Code, *see* TEX. INS. CODE, art. 3.49, Texas courts have held firm in recent years declining to give employers an insurable interest in all of their employees: "The mere existence of an employer/employee relationship is never sufficient to give the employer an insurable interest in the life of the employee." *Stillwagoner*, 979

---

[43]    (...continued)
        proper service on Ruby, Ruby and the insurer had submitted to the Texas courts, the insurance proceeds had been paid into the court registry, and the parties had agreed to proceed to resolve the matter only in the Texas court. The court concluded that under Texas law, a former wife did not have an insurable interest in the life of her former husband. *Id.* at 593-94.

[44]    Wal-Mart's Reply, at 5.

[45]    *See generally Cheeves*, 28 S.W.2d at 275 (holding, in 1894, that "[i]t is against the public policy of this state to allow any one who has no insurable interest to be the owner of a policy of insurance upon the life of a human being."); *Tamez*, 999 S.W.2d at 18 (applying Texas insurable interest case law to COLI policy); *Stillwagoner*, 979 S.W.2d at 358 (tracing the origin of the doctrine to an English statute from the reign of King George III, which was received into the common law of Texas).

S.W.2d at 361; *see Tamez*, 999 S.W.2d at 17-19.[46] Accordingly, Defendants' attempts to characterize the insurable interest doctrine as "obsolete" or "weakened" fails.

Hartford asserts that, even if the Texas insurable interest doctrine has continued vitality, Article 21.42 of the Texas Insurance Code expresses the state's current policy to limit the extraterritorial application of Texas law. Article 21.42 provides in relevant part:

> Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance.

Hartford argues that "Article 21.42 is designed to ensure only that Texas law will apply to contracts made between Texas citizens and insurance companies doing business in Texas, *when and only when* those contacts are made in the course of the company's Texas business," and thus the Texas Legislature intended to exclude COLI policies payable to beneficiaries outside Texas.[47] This argument is rejected. First, there is nothing in Article 21.42 to support the inference that the Texas Legislature, in enacting Article 21.42, intended to repeal by implication the longstanding, prophylactic common law insurable

---

[46] *See, supra*, at 12-13; *see also Drane*, 161 S.W.2d at 1058-59; *accord, DeLeon*, 259 F.3d at 350. The "key man" concept was recognized in Texas in 1921. In certain carefully circumscribed circumstances, corporations may have an insurable interest in the lives of certain "key" persons within the company. The "key man" concept includes the lives of officers and stockholders to whom the other stockholders look primarily for the success of the business or on whose services the corporation depends for its prosperity, and whose death will cause a substantial loss to it. *Stillwagoner*, 979 S.W.2d at 358; *see Tamez*, 999 S.W.2d at 18 n.4. No Defendant contends that any specific Plaintiff in this case was a "key man," although Defendant Hartford seeks discovery on the issue, citing FED. R. CIV. P. 56(f). *See* Hartford Life Insurance Company's Response to Camelot Plaintiffs' Motion for Partial Summary Judgment [Doc. # 39], at 5-6 n.4. The Camelot Defendants do not join Hartford in this motion. This request is denied for reasons explained in detail *infra* at Section VI.B.1.

[47] Hartford's Reply, at 11 (emphasis in original). There is no dispute that, on its face, Article 21.42 does not apply in this case. Defendants' COLI policy provisions by design are not "payable" to Texas citizen Plaintiffs. *See New York Life Ins. Co. v. Baum*, 700 F.2d 928, 933 (5th Cir. 1983) (article 21.42 of the Texas Insurance Code has been interpreted to apply "when and only when [the life insurance contracts] are made in the course of the [insurance] company's Texas business" (citing *Howell v. Am. Life Stock Ins. Co.*, 483 F.2d 1354, 1359 (5th Cir. 1973) (internal citations omitted))).

interest doctrine. The Texas Legislature by Article 21.42 expressed its intent to expand Texas regulatory authority to foreign entities doing business in Texas, who elect to pay or designate beneficiaries who live in or are citizens of Texas. There is no basis to conclude that this legislative decision represents an intention by Texas to abandon silently the insurable interest doctrine that protects its citizens in a different circumstance, namely, when the insured, rather than the beneficiary, is the Texas resident. The Court therefore rejects Defendants' attempt to discount the Texas insurable interest doctrine as obsolete or as limited by Article 21.42.

*Georgia's Interests in Determination of the Issues.*– Defendants argue that Georgia has a stronger interest than Texas in the application of its public policy. Defendants also posit that enforcement of the Texas policy in this case will infringe Georgia's public policy.[48]

These contentions are singularly unpersuasive. Nothing in the record establishes that the State of Georgia has an interest in enforcing its laws in Texas as to Texas inhabitants. Indeed, Defendants fail to answer meaningfully the question why the Georgia Legislature or Georgia citizens care if an employer (within or outside of Georgia) is prohibited from obtaining insurance on the life of its Texas employees. There is no indication that the State of Georgia intended this result when adopting its insurable interest statutes.

Defendants' analysis, taken to its logical conclusion, is that the state of Georgia may unilaterally authorize any company or person claiming a connection to that state to abrogate a contrary public policy in the remaining forty-nine states. Under Defendants' theory, in order to impose Georgia's law on all other states, all any employer need do is purchase a COLI policy on employees nationwide, while the employer's representatives are in Georgia, or purchase through a legal entity created for the purpose of invoking

---

[48]   Wal-Mart argues, for example, that "Georgia has a statutorily-created policy to allow corporations to site COLI policies in Georgia that would be fully enforceable. Georgia's public policy would be thwarted if Texas' antiquated common law were to control." Wal-Mart's Summary Judgment Motion [Doc. # 19], at 17.

Georgia law.[49] If this extraterritorial application of one state's law to citizens of another state were applied universally, then states could not enforce their own conflict of laws doctrines in their own courts, and states' substantive law would be impossible to ascertain with any certainty.

In any event, this Court is not obligated to give effect within the State of Texas to the laws of other states if the laws violate the fundamental Texas public policy. A "state is not required to enforce a law obnoxious to its public policy." *Griffin*, 313 U.S. at 507.

As to the extraterritorial application of state law, Defendants also rely on *Home Insurance Co. v. Dick*, 281 U.S. 397 (1930). Defendants argue that application of the Texas insurable interest doctrine in the case at bar "raises serious Constitutional questions involving due process."[50] This argument lacks merit. *Home Insurance* involved a property damage claim for coverage under insurance issued in Mexico by a Mexican underwriter of a tugboat that operated outside the United States. The insurance was owned and negotiated by a person while living and working in Mexico.[51] Neither the

---

[49] Wal-Mart and the Insurer Defendants, headquartered in various states, set up the Wal-Mart Trust for the purpose of attempting to gain the benefit of Georgia insurable interest law. The Camelot Defendants agreed among themselves that Georgia law should apply despite any meaningful contacts with that state. This evidence is not probative of the intent of the state law's drafters or the Georgia Legislature.

[50] Wal-Mart's Reply, at 9.

[51] Dick, a citizen of Texas, brought an action in a Texas court in Texas on a fire insurance policy for property damage to a tugboat issued by a Mexican insurance company. *Home Insurance*, 281 U.S. at 402. Because the state court did not have jurisdiction over the Mexican insurer, Dick asserted *in rem* jurisdiction against two American reinsurance companies ("garnishees") that reinsured parts of the underlying policy. *Id.* The garnishees raised as a defense a provision in the underlying policy with the Mexican insurer that imposed a one-year statute of limitations on actions for the collection of any claim under the policy. *Id.* at 403. This provision was consistent with Mexican law, but it violated a Texas statute that prohibited agreements to limit the applicable limitations period to shorter than two years. *Id.* at 404-05. The trial, appeals, and supreme courts of Texas held that the Texas law applied and that the action could not be barred by the one-limitations agreement. *Id.* at 405. The United States Supreme Court reversed on the ground that the Texas statute deprived the garnishees of property without due process. *Id.* at 407.

insurance contract, the subject-matter of that contract, nor the parties had any meaningful contacts with Texas. The Supreme Court ruled that "[a] state may of course prohibit and declare invalid the making of certain contracts within its borders. Ordinarily, it may prohibit performance within its borders, even of contracts validly made elsewhere, if they are required to be performed within the state and their performance would violate its laws." *Home Insurance* 281 U.S. at 407.[52] The *Home Insurance* ruling thus actually supports Plaintiffs' position.

The facts in the case at bar are also materially distinguishable from those in *Home Insurance*. Here, Defendants chose to insure the lives of employees who, at the inception of the policies in issue, lived (and now may still live) in Texas. At the time these employees were insured, information on these employees had to be gathered from Texas. The insurable risk is inescapably connected to the insured's physical location, which, for Texas insureds, is in the State of Texas. When insureds residing in Texas die, information must be obtained from this state, and their estates are likely to be probated here. These connections to Texas are materially different from *Home Insurance* where there was an absence of any contemporaneous contact by the parties or the property subject to the insurance in issue.[53]

In addition, the Supreme Court decided *Home Insurance* eleven years *before* its *Griffin* decision. In *Griffin*, as discussed above, the Supreme Court specifically held that it would be constitutionally permissible for Texas to apply its insurable interest doctrine to a foreign contract.

---

[52]    The Court focused on the fact that "nothing in any way relating to the policy sued on or to the contracts of reinsurance [giving rise to the *res* allegedly subject to garnishment], was ever done or required to be done in Texas," *id.* at 408, and that "[a]t all times here material [Dick] was physically present and acting in Mexico [thus outside Texas,] Texas was therefore without power to affect the terms of the contracts so made." *Id.*

[53]    The only relationships between Texas and the dispute were that Texas was technically Dick's permanent residence and that another payee of the policy proceeds "Texas & Gulf Steamship Company" appeared to have some unexplained connection to that state. *Id.* at 408. The Supreme Court was unpersuaded by these facts.

Thus, the Court rejects Defendants' arguments that Georgia has a stronger interest in the disputed issues than Texas. Giving Georgia law the extraterritorial effect requested by Defendants would encroach on the Texas Legislature's and Texas courts' prerogatives. The Court also rejects Defendants' contention that *Home Insurance* controls this case or limits Texas courts' application of the Texas insurable interest doctrine. Requiring compliance with the Texas insurable interest doctrine is not an improper extraterritorial application of Texas law.

### 2.  The Basic Policies Underlying the Particular Field of Law

The issues in this case implicate the fundamental purpose of and policies underlying life insurance. Under Texas law, "the essential foundation of a life insurance policy is the life of a human being." *Gibralter Colorado Life Ins. Co. v. Taylor*, 123 S.W.2d 318, 321 (Tex. 1939). The primary purpose of life insurance is the "protection of those who would be pecuniarily damaged by the death of the insured." *Hildbrandt v. Ames*, 66 S.W. 128, 131 (Tex. Civ. App. 1901, writ ref'd). Texas courts have held generally that "to permit those who would not be so damaged to receive the benefit of the policy would be to defeat the purpose and intent of the contract." *Id.*; *accord Hansen v. Blackmon*, 169 S.W.2d 955, 962 (Tex. Civ. App.–El Paso 1942), *aff'd* 169 S.W.2d 962 (Tex. 1943) ("The primary purpose of life insurance is not investment, but protection."). Texas courts follow this principle when applying the insurable interest doctrine:

> Bluntly expressed, insurable interest . . . is determined by monetary considerations, viewed from the standpoint of the beneficiary. Would [the beneficiary] regard himself as better off from the standpoint of money, would [the beneficiary] enjoy more substantial economic returns should the insured continue to live; or would [the beneficiary] have more, in the form of the proceeds of the policy, should [the insured] die? Therefore, it is said that if the situation is such that [the beneficiary] might be led to conclude that he would profit by [the insured's] death, the policy is void as to him since the public has a controlling concern that no person have an interest in the early death of another, an interest that may give rise to a temptation to destroy [the insured's] life.

*Drane,* 161 S.W.2d at 1059. Enforcement of the Texas insurable interest doctrine advances Texas policies underlying insurance law.[54]

### 3. The Protection of Justified Expectations and the Need for Certainty, Predictability, and Uniformity of Result

Defendants argue that the protection of justified expectations, and the need for certainty, predictability, and uniformity of result, demand enforcement of the COLI policies using Georgia law. Defendants stress that, when they created the COLI policies, they expected that Georgia law would apply to those policies. Defendants acknowledge that there are no choice of law provisions in the COLI policies. Nevertheless, Defendants contend that the choice of law provisions in the Wal-Mart Trust Agreement, the Wal-Mart Trust's location, and all Defendants' activities in Georgia require that the issues in this case be governed exclusively under Georgia law. Defendants further assert that application of Georgia law nationwide would advance the goal of uniformity and predictability of the result under the COLI policies.

Under the Restatement, reliance by contracting parties on their agreed terms, including selection of laws, ordinarily is a significant consideration. RESTATEMENT § 187. The parties' agreed terms, however, cannot control in every circumstance. Particularly when an integral interested party, such as the insured in an insurance contract, played no active part in the creation of the contract in issue, the other parties' self-serving

---

[54] The parties debate issues regarding the COLI policies' surrender value. Thus, the public policy underlying surrender value is also pertinent. The surrender value of a life insurance policy, in contrast to the primary purpose of the insurance, is "a debt against the insurance company, which debt may be assigned to one who has no insurable interest. *Shoemaker v. American Nat'l Ins. Co.*, 48 S.W.2d 612, 614 (Tex. Comm'n App. 1932, jdgm't adopted). When necessary to avoid inequitable results, Texas courts treat the surrender value of an insurance policy differently from death benefits. For example, a beneficiary who no longer has an insurable interest in a former spouse may be entitled to part of the surrender value of a life insurance policy to the extent that the beneficiary made contributions to premium payments. *Shoemaker,* 48 S.W.2d at 614; *Berdoll v. Berdoll,* 145 S.W.2d 227, 230 (Tex. Civ. App.–Austin 1940, writ dism'd).

expectations cannot automatically govern choice of law issues in the parties' disputes.[55] Plaintiffs did not negotiate or agree to the COLI contract terms. Nor did many even know of the insurance at all.

The Court concludes that Defendants' expectation when entering into the COLI contracts that Georgia law would apply with regard to Texas insureds was not justified. Defendants admittedly set up the COLI policies in Georgia and selected Georgia law to avoid contrary public policies in states such as Texas. In doing so, Defendants are deemed to have taken the risk that a Texas court would decline to apply Georgia law, as prior Texas cases indicated.

Defendants also fail to demonstrate how application of Georgia law to Texas insureds advances the need for certainty, predictability, and uniformity of result. Defendants provide no meaningful reason why Texas citizens and residents should not be able to count on enforcement of the longstanding Texas insurable interests doctrine. Rather, Defendants look at the matter from solely their own perspective, contending that private parties should be able to contract for the result they desire without regard to the effect of the contract on others. The Restatement § 6's goal of the need for certainty, predictability, and uniformity of result is not intended to serve as a subterfuge for parties to override public policies and laws. The goal of certainty, predictability, and of uniformity served in the case at bar by the consistent application of Texas law to Texas citizens, not application of Geogia law at Defendants' behest.

### 4. Needs of Interstate and International Systems and Ease in the Determination and Application of the Law to be Applied.

Defendants contend that it would serve the interstate system for courts to permit parties to make contracts involving residents of other states. This contention is unfounded when the contracts flout an established public policy of another state by

---

[55]     *Cf.* Restatement § 188 cmt. b ("Protection of justified expectations plays a less significant role in the choice-of-law process with respect to issues that involve the nature of the obligations imposed by a contract upon the parties rather than the validity of the contract or of some provision thereof.").

manipulating choice of law considerations, the interstate system is undermined. *Cf.,* *Griffin*, 123 F.2d at 551 ("[W]e have no reason to think that the courts of Texas would permit citizens of other states to speculate upon the death of one of its citizens by means of contracts made without the state when the same is forbidden within its territorial limits."). Interstate or international systems are advanced by each jurisdiction having easily ascertainable, certain, uniform, and predictable law governing disputes in that jurisdiction.

The application of Texas law to insurance contracts on the lives of Texas residents and citizens is an easily ascertainable rule that respects each jurisdiction's choices and priorities. The application of Texas insurable interest law is not difficult. As set forth above, the doctrine is well established in Texas and has been uniformly applied. It is common that, in matters a state has authority to regulate, the state's courts consistently will apply that state's law to disputes involving its citizens. Defendants' insistence that private contracting parties be able to impose on non-signatories the state law the contracting parties select, despite the impact of that law on other state's citizens, contravenes the uniformity of Texas law, thereby undercutting the needs of an interstate system and the promotion of ease of determination and application of the law to be applied.

### D.     <u>Application of Texas Choice of Law Principles to the COLI Contracts</u>

#### 1.     Analysis of Restatement § 188 Principles for Contract Disputes

As discussed above, the choice of law analysis in contract cases focuses on the parties' contacts with a jurisdiction in the following respects:

    (a)     the place of contracting,

    (b)     the place of negotiation of the contract,

    (c)     the place of performance,

    (d)     the location of the subject matter of the contract, and

    (e)     the domicile, residence, nationality, place of incorporation and place of business of the parties.

RESTATEMENT § 188(2); *Minnesota Mining and Mfg. Co.*, 953 S.W.2d at 735-36; *Maxus Exploration*, 817 S.W.2d at 53-54; *Houston Casualty Co. v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 2d 789, 797 (S.D. Tex. 1999). The choice of law analysis must be performed under § 188(2) for each disputed issue. "Some contacts are more important than others because they implicate state policies underlying the particular substantive issue." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984).[56] The comments to the Restatement further teach that "[s]tanding alone, the place of contracting is a relatively insignificant contact." RESTATEMENT § 188 cmt. e. Ultimately, the selection of the applicable law depends on the qualitative nature of the parties' particular contacts with the respective jurisdictions. *Duncan*, 665 S.W.2d at 421.

### 2. The Wal-Mart COLI Policies

In this case, the Wal-Mart Defendants allege that the Wal-Mart COLI policies have the most significant contacts with the state of Georgia and that Wal-Mart intended Georgia's law to apply. The Wal-Mart Defendants allege that the Wal-Mart Trust was created in Georgia to purchase the COLI policies from Defendants AIG and Hartford. The Wal-Mart Trust Agreement ("Trust Agreement") named Wachovia, a bank doing business in Georgia, as the Trustee and established Georgia as the situs of the Wal-Mart Trust.[57] Wal-Mart, through the Wal-Mart Trust, directed the purchase of the COLI policies between December 1993 and sometime in 1995.[58] Raymond H. Sapp, a trust

---

[56] *Accord, Minnesota Mining and Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996) ("We evaluate state contacts not by their number, but by their quality."); *Guitierrez v. Collins*, 583 S.W.2d 312, 319 (Tex. 1979) ("[W]e would emphasize that application of the 'most significant relationship' analysis should not turn on the number of contacts, but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in Section 6."). *See Duncan*, 665 S.W.2d at 421 ("[S]election of the applicable law depends on the qualitative nature of the particular contacts.").

[57] Trust Agreement, arts. 6.1, 7.4 (Exhibit 11 to Emerick Aff.).

[58] It is clear from the face of the Wal-Mart Trust Agreement that it was solely a vehicle through which Wal-Mart directed its investment in the COLI policies. The Trust Agreement states that Wal-Mart "will effectuate insurance on the Insureds [*i.e.*, Wal-Mart employees] through
(continued...)

officer of Wachovia who was involved with creation of the Wal-Mart Trust, attests that: (i) Wal-Mart applied for and was issued the COLI policies in the state of Georgia, (ii) premium payments were made by the Wal-Mart Trust by wire transfer from Georgia to the offices of AIG and Hartford, and (iii) none of the COLI policies were made, issued, received, paid, or performed in Texas.[59]  Wal-Mart established the Wal-Mart Trust and "structured its COLI program in this way to take advantage of favorable Georgia law on

---

[58]     (...continued)
this Trust." Trust Agreement, art. 1 (Exhibit 11 to Emerick Aff.).  Under the Trust Agreement, Wachovia is to purchase and hold COLI policies "at the direction of the Grantor [*i.e.*, Wal-Mart]." *Id.*, art. 4.1.  Furthermore, Wachovia is to pay trust property, including proceeds from the COLI policies, to Wal-Mart at its direction.  *Id.*, art. 5.1.  The Trust Agreement provides that the "Trust is for the sole and exclusive benefit of the Grantor [*i.e.*, Wal-Mart] and Trustee . . . . No other person . . . shall be entitled to rely on or enforce any provision of this Trust." *Id.*, art. 1.  The Trust Agreement further provides that the purposes of the Trust are:

> (i) to hold one or more policies of insurance on the life or lives of any or all of the present employees and future employees of the Grantor and its subsidiaries (the "Insureds"); (ii) to receive the proceeds of any such policy as and when such proceeds become payable; and (iii) to pay the Grantor from the cash assets (including the cash value of any insurance policies) of the Trust such amount or amounts as Grantor may from time to time direct.

*Id.* The Trust was not responsible for the collection of life insurance proceeds.  *Id.*, art 4.3 Instead, the Trustee merely was to receive and hold whatever benefits were paid by the insurance companies.  *Id.*  Wal-Mart itself was responsible for notifying the insurers of claims, providing proof of death of an insured, or pursuing collection of benefits.  *Id.*  The Trust Agreement states: "The Trustee shall have *no duty or obligation* to monitor the death of any Insured, to notify the Grantor of any such death *or to take any action to collect any proceeds or benefits* under any insurance policies on any Insured." *Id.*  The Trust Agreement further states: "The Trustee shall not be responsible for the administration and distribution hereunder of such proceeds until they are actually paid to the Trustee." *Id.*  Wal-Mart had the authority to request that the Trustee collect policy benefits, but only if Wal-Mart indemnified the Trustee for "all liabilities and expenses" related to a collection action.  *Id.*

[59]     Affidavit of Raymond H. Sapp ("Sapp Aff."), ¶¶ 1-5 (Exhibit B to Wal-Mart's Exhibits)

'insurable interest.'"[60] Based on these facts, Wal-Mart and the Insurer Defendants argue that all of the contacts listed in Restatement §188 favor the application of Georgia law.[61]

After consideration of all the parties' contacts with various states, in light of the contacts' relative importance to the insurable interest issue, this Court holds that Texas choice of law rules dictate that Texas insurance law should apply to Plaintiffs' claims. The detailed analysis follows.

*__Place of Contracting__*.– Defendant Wal-Mart contends that its evidence establishes that the COLI policies were applied for and issued in Georgia. Plaintiffs point to inconsistencies in Wal-Mart's evidence and argue that they need discovery to obtain evidence that raises fact issues regarding the place of contracting.[62]

The Court finds Defendants' evidence is vague and inconclusive. Sapp, a Wachovia bank employee who was responsible for trust administration generally and the Wal-Mart Trust in particular, avers that the COLI policies Wal-Mart ultimately purchased were "applied for" in a meeting in Atlanta, Georgia on December 28, 1993, and were "issued" and "received by the Trust" there.[63] This and the other evidence before the Court suggests that Sapp signed the application in Georgia and sent them to the insurers' home offices in various states and the insurers sent the policies from their home offices to Sapp in Georgia. The place of Sapp's signing the AIG policy documents is pertinent but not dispositive as to the "place of contracting" factor. The AIG application also is signed by the insurance agent and an AIG Vice President, but their locations when they signed are not established in the record. Nothing in the record specifically establishes that the

---

[60] Wal-Mart's Summary Judgment Motion, at 18.

[61] It is noted that the parties have submitted no evidence about the creation of the Sims Policy in particular. Thus, the Court assumes that the evidence pertaining to the Wal-Mart COLI policies applies equally to the Sims Policy.

[62] Declaration of Scott M. Clearman in Support of Request for Denial or Continuance of Summary Judgment (FED. R. CIV. P. 56(f)) ("Clearman Decl."), ¶¶ 30-36. This motion is denied as moot.

[63] Sapp Affidavit, ¶ 4.

other parties to the contract documents signed in Georgia. Thus, there is a fact issue as to the "place of contracting."[64]

This fact issue, however, is not material. Even if there was sufficient evidence to meet Wal-Mart's summary judgment burden to establish Georgia as the place of contracting, the Court finds that this factor alone is inadequate to justify the application of Georgia law. Each contact must be evaluated "according to their relative importance with respect to the particular issue." RESTATEMENT § 188(2). Defendants contrived to make Georgia the place of contracting for the express purpose of taking advantage of favorable Georgia law on insurable interests. Wal-Mart attempted artificially to avoid the Texas insurable interest doctrine. In view of the policy considerations involved in that doctrine, which must be considered under Restatement § 6, the Court accords the "place of contracting" factor little weight in the choice of law analysis in this case.

***Place of Negotiation***.– Defendants argue that the "place of negotiation" factor favors the application of Georgia law to the Wal-Mart COLI policies. Defendants' sole evidence for this assertion is the superficial testimony of Sapp. Sapp avers that the Wal-

---

[64]    Other evidence suggests that Georgia was not the "place of contracting." The policy provisions immediately above the contracting parties' signatures evidence that "[n]o policy will take effect unless and until, while the Insured is living, the application is approved, the full initial premium is paid, the policy is delivered and accepted by the owner, and answers and statements in this application continue to be complete and true *at the time of* such payment and acceptance." AIG Life Insurance Application (emphasis added) (attached to the Sapp Affidavit as the second to last page of Exhibit 10). This suggests that some representative of the insurer was to check on the health of the insureds, presumably where the insureds were located. This verification was to occur after the insurer signed the policy and received payment, but before delivery of the policy to the owner. Wal-Mart does not produce any evidence or make any argument concerning this practice.

It also is notable that the AIG Letter of Understanding, dated December 28, 1993, which was made a part of the Wal-Mart/AIG COLI policy contracts, provides that the parties' agreement to purchase insurance does not take effect unless, *inter alia*, AIG *receives* the total first year premium. *See* Letter of Understanding, at 2 (Exhibit 12 to Sapp Aff.). AIG declared in various places in the parties' contract documents that payments must be *received in Delaware* at the AIG administrative office. This significant contact with Delaware also undermines Defendants' arguments that Georgia was the "place of contracting."

Mart COLI policies were "applied for" in a meeting in Atlanta, Georgia, on December 28, 1993.[65] This evidence does not address explicitly where the *negotiations* took place.[66] Indeed, Wal-Mart's corporate headquarters are in Arkansas, the company has facilities all over the nation, and the insureds live in many states. The broker's contact information on one of the application forms was in Minnesota.[67] Further, the Insurer Defendants are not headquartered in Georgia. There is no specific evidence as to the identity of the representatives who negotiated for these Defendants the material terms of the COLI policies, such as the size of the premiums. Nor is there evidence as to who gathered crucial data about the Texas insureds, or how the information was amassed, for the COLI policies. Accordingly, Defendants have failed to establish Georgia as the "place of negotiations" for the Wal-Mart policies.

Even if Defendants are deemed to have shown that some key negotiations occurred in Georgia, this contact does not justify the application of Georgia law to Plaintiffs' claims against Wal-Mart. As previously noted, Defendants contrived to submit the applications for the thousands of COLI policies covering employees nationwide. Defendants' participation in a meeting in Georgia was specifically for the purpose of

---

[65] Sapp Aff., ¶ 3. Plaintiffs again contend that they need discovery to develop a response on this factor, if the Court is inclined to find that Georgia law applies based on Defendants' arguments. *See* Plaintiffs' Response to Hartford's Motion for Summary Judgment, at 1 (adopting Rule 56(f) motion made in response to other Defendants' Motions); The Estate of Douglas Sims' Response to AIG Life Insurance Company's Motion for Summary Judgment, at 8-10 (discovery needed for choice of law issue). These motions are denied as moot.

[66] In the unlikely event that all negotiations regarding the thousands of transactions took place in this single meeting, Sapp's own testimony on the application process is somewhat internally inconsistent. In his affidavit, he attests that he executed, on behalf of the Wal-Mart Trust, only the application for the AIG policies on December 28, 1993. *Id.*, ¶ 3. He references several times a "first" or "initial block" of COLI policies, but never details the events as to other blocks. Sapp did not execute the Hartford COLI policy application until December 30, 1993, two days after the meeting at which he swears that applications were submitted for *all* policies purchased by Wal-Mart. *Id.*, ¶¶ 3, 4.

[67] *See* "Client Master Information Form, Exhibit A" attached to the parties' Letter of Understanding. (Exhibit 12 to Sapp Aff.)

invoking favorable Georgia law and thereby attempting to evade Texas public policy. In light of the policy factors discussed above, the dearth of probative evidence on any negotiations, and the artificiality of the putative contacts with Georgia, the Court gives the "place of negotiation" factor no weight in its choice of law analysis.

***Place of Performance***.– Defendants argue in conclusory fashion that the place of performance favors application of Georgia law. Defendants contend that the Wal-Mart Trust was located in Georgia, and that all premiums were paid from, and policy proceeds were paid to, that Trust in Georgia. Defendants' contentions are not persuasive.

The Court has considered the fact that the nominal owner of the policies, the Wal-Mart Trust, was located in Georgia and that all monies relating to the policies went through the Trust.[68] However, it is clear that all the Wal-Mart Trust's activities were conducted at the express direction of Wal-Mart. The Wal-Mart Trust was created for the purpose of serving, and in fact served, as a mere conduit in Georgia for the funds paid by Wal-Mart. The Wal-Mart Trust had only ministerial functions in the administration of the COLI policies. Thus, Defendants have not established that there are substantial contacts with Georgia on the place of performance factor. On the other hand, under the Wal-Mart/AIG COLI policies, all premium payments were not "received" and thus counted unless the payments reached the AIG headquarters in Delaware.[69] Also, the "Renewable Level Term Insurance Rider," Form 49827 (3/90), an integral part of the COLI policies, as evidenced by the Sims Policy, recites that it was "[s]igned for the Company at Wilmington, Delaware."[70] If an insurance contract specifies that premium payments are to be made at the insurance company's home office, the general Texas rule is that the

---

[68] Defendants argue in this vein that the Wal-Mart Trust "purchased" the COLI policies in Georgia. To the extent Defendant Wal-Mart intends to refer here to something other than the location from which it caused the Trust to send payments, the term "purchased" relates to the "place of contracting" and not the "place of performance." Thus, this evidence is entitled to no weight as to the "place of performance" factor.

[69] *See* Sims COLI Policy, at 4.

[70] *Id.*, at second page following page 15.

place of performance of the contract is the state in which the insurer's home office is located.[71] *Seiders v. Merchants Life Ass'n,* 54 S.W. 753, 754 (Tex. 1900) (holding that place of performance of a life insurance contract was the state where premiums were made payable, even if the contract was made in another state). *Accord, New York Life Ins. Co. v. Baum,* 700 F.2d 928, 933 (5th Cir. 1983); *American National Insurance Co. v. Huckleberry,* 638 F. Supp. 233, 235 (N.D. Tex. 1986).

In addition, the Wal-Mart COLI policies issued by AIG require that all required written notice and requests be sent to the insurer's Delaware office.[72] Payment of proceeds under those policies occurred only when "proof is received at our [insured's] administrative office [in Delaware] of [the] Insured's death."[73]

Further, Wal-Mart, doing business nationwide, and headquartered in Arkansas, was the true beneficiary of these insurance policies. Evidence of this fact appears in "Client Master Information Form, Exhibit A" attached to the parties' Letter of Understanding.[74] The "Company Name to Appear on Policy" was "Wal-Mart Stores, Inc.," with an Arkansas address. Only the "Billing Address" was Wachovia Bank of Georgia, N.A. in Atlanta.

Finally, Wal-Mart's argument fails to address a critical component of the performance of the COLI polices, payment by the insurer of the benefits upon death of the insured. The parties agree that definitive proof to the Insurer Defendants of death of an insured is necessary before policy benefits are payable to the beneficiary. This proof,

---

[71] There is logic behind this rule. The legally significant action in a premium payment does not occur in the state where the insurance policy owner writes a check or arranges for a wire transfer. Instead, a policy owner receives credit for providing consideration, the premium payments, for the insurance coverage when the payments successfully reaches the insurance company, as required by the insurance policy.

[72] *See* Exhibit 10 to Emerick Aff., at 14.

[73] *Id.* at "Renewable Level Term Insurance Rider" Form 49827 (3/90), Exhibit 10 to Emerick Aff., at page following page 15.

[74] Exhibit 12 to Sapp Aff.

for Texas residents, can only be obtained from the records of the state of Texas. Georgia has no connection to this aspect of performance.[75]

The court accordingly concludes that the location of the Wal-Mart Trust and the facts on which Wal-Mart relies are not dispositive in the § 188 choice of law analysis in connection with the dispute at bar. After considering all the contacts of the parties regarding performance of the COLI policies generally and the Sims Policy specifically, it is apparent that Georgia has only a weak connection to these insurance policies with respect to the "place of performance." Texas has a significant relationship in this regard, which tips this important factor heavily in favor of Texas.

***Location of the Subject Matter of the Contract***.– Defendant Wal-Mart asserts that the location of the subject matter of the COLI policy contracts favors the application of Georgia law. Wal-Mart focuses on the fact that the Insurer Defendants paid COLI policy proceeds on deceased insureds to the Wal-Mart Trust in Georgia. Wal-Mart further asserts that the only contact with Texas was the place of residence of employee Douglas Sims, a Texas resident. Wal-Mart's assertions ignore the existence of the responsibilities, risks, and rewards to the insurance carriers and to Wal-Mart during the life of the insureds under the COLI policies. Wal-Mart was obligated to pay the Insurer Defendants premium payments while the Wal-Mart COLI policies were in effect.[76] These policies involved financial obligations during the insured's life, as well as upon the insured's death. For the Sims Policy, and policies on Texas insureds, the location of the insureds is crucial to Defendants. During any insured's life, proof that the insured is in fact still living entitles the insurer to premiums from the policy owner. When an insured such as Sims died, different contractual responsibilities applied; the insurer then was obligated to pay the

---

[75]   An incontrovertible corollary on the performance factor is that payment of premiums during the life of the insureds is an important feature of the COLI policies. Premiums are not due on an insured unless the insured is alive. If a party seeks to determine the status of the Texas resident insured, communication with Texas is necessary.

[76]   These payments were due at the insurers' home offices, which were not in Georgia (or Texas) as noted above.

policy proceeds. That obligation arose generally as a result of an event in Texas, the death of the insured. It is the insured's life that is the subject matter of the COLI policy. Since Sims and the other Plaintiffs in this suit are (or were) citizens or residents of Texas, the location of the subject matter of the COLI policies is Texas.

This result is consistent with Texas law. Texas courts have held that the subject matter of a life insurance policy is the life of the insured. Specifically, a life insurance policy that lapsed before the insured died cannot be reinstated after the insured's death because the insured's life – the subject matter of the policy – no longer exists. *Gibralter Colorado Life Co. v. Taylor*, 123 S.W.2d 318, 321 (Tex. 1939); *P.M. Baker v. Penn Mutual Life Ins. Co.*, 617 S.W.2d 814, 815-816 (Tex. Civ. App.–Houston [14th Dist.] 1981, n.w.h.). "The essential foundation of a life insurance policy is the life of a human being." *Gibralter*, 123 S.W.2d at 321.

The Restatement provides that "[t]he state where the [subject of the contract] is located will have a natural interest in transactions affecting it." RESTATEMENT § 188, cmt. e. Accordingly, the location of the subject matter of the Sims Policy and the other COLI policies insuring the lives of Texas citizens or residents is Texas.

Public policy considerations prompt the Court in this case to give the "subject matter of the contract" factor great significance in the choice of law analysis. The Texas insurable interest doctrine exists to protect the lives of Texas citizens. *Cheeves*, 28 S.W.2d at 275 ("It is against the public policy of this state to allow any one who has no insurable interest to be the owner of a policy of insurance upon the life of a human being."); *Griffin v. McCoach*, 123 F.2d at 551 ("The [insurable interest] rule in Texas is for the protection of the lives of its citizens."). This Texas public policy is integrally intertwined with the subject matter of the contracts in issue.

***Domicile of the Parties***.– Defendants argue that the domicile of the parties to the COLI policies favors the application of Georgia law. In support of this argument, Defendant Wal-Mart asserts that the Wal-Mart Trust is located in Georgia. However, the Wal-Mart Trust is an entity entirely controlled and funded by Wal-Mart; the Trust exists

merely to perform ministerial functions at Wal-Mart's direction and to serve Wal-Mart interests in attempting artificially to obtain the protection of Georgia law as to the COLI policies. Accordingly, Wal-Mart's placement of the Wal-Mart Trust in Georgia does not dictate the application of Georgia law.

It is undisputed that none of the other parties to the contract has its domicile, state of incorporation, or principal place of business in Georgia. The Insurer Defendants are domiciled in Delaware and Connecticut, respectively. Wal-Mart is domiciled in Arkansas. The insureds, whom Defendants all contend are parties to the COLI contracts, are domiciled in Texas.

The location of the Wal-Mart Trust is insufficient to establish that the "domicile of the parties" element of the choice of law analysis favors Georgia law. Indeed, because the Plaintiff-insureds are domiciled in Texas, Texas has at least as strong a connection as Georgia to this dispute under this choice of law factor. Thus, the "domicile of parties" factor is inconclusive.

*__Conclusion on the Choice of Law Under Restatement § 188 and § 6__*.– The Restatement § 188 factors *per se* reveal that there is no one state with clearly the "most significant contacts" for this dispute. As between Georgia and Texas, Texas has far stronger contacts than Georgia. Texas is the place of Sims's and the other insureds' domiciles, the place of the subject-matter of the COLI policies, and the place of the most significant aspects of performance of the contracts. Evidence on the places of contracting and negotiation is sparse and inconclusive, and these factors are entitled to little weight. The Restatement § 6 factors point strongly to Texas as the place with the most significant contacts. The purpose of insurance, the need for certainty, predictability and uniformity of result, as well as other factors, all point to Texas as the state with the most significant interest in the application of its law and public policies to this dispute. When the § 188 factors are considered in light of the § 6 considerations, as the Restatement directs, Texas choice of law mandates that Texas law be applied in this case.

***The Fifth Circuit* Baum *Decisions*.**— Defendants contend that *New York Life Ins. Co. v. Baum*, 700 F.2d 928 (5th Cir. 1983) ("*Baum II*"), dictates that Georgia law be applied in this case because that state has the most contacts to the COLI policies in issue. *Baum*, however, is inapposite.[77]

In *Baum*, the insurer, New York Life, filed an interpleader action in a Texas federal court, seeking a declaratory judgment that the policy was void for lack of an insurable interest, and that no beneficiary should receive the proceeds of the policy. *New York Life Ins. Co. v. Baum*, 617 F.2d 1201, 1203 (5th Cir. 1980) ("*Baum I*"). The district court granted summary judgment to New York Life, holding that Louisiana law applied to the life insurance contract, and that under Louisiana law, the contract was void *ab initio*

---

[77]    The *Baum* case generated three decisions by the Fifth Circuit Court of Appeals. Noel Baum and Bill Cook agreed to form an advertising joint venture named "Media Sales & Marketing, Inc." ("Media"), a business in which Baum owned the controlling interest, and apparently intended to incorporate in Louisiana. *Id.* In fact, Media was never formally incorporated. *See New York Life Ins. Co. v. Baum*, 617 F.2d 1201, 1202-03 (5th Cir. 1980) ("*Baum I*"). The venture's principal place of business was Houston, Texas. Baum lived in Louisiana and Cook in Texas. Baum was to own and control the business during the early stages and Cook and a third person, Cutler, were to buy in later after the business began generating income. *Id.* at 1202. Baum lent considerable sums of money to the business and arranged a line of credit. *Id.* To protect his investment, Baum and Cook agreed that Baum could purchase key man life insurance on Cook, providing for Media as the owner and Baum (as a partner) the beneficiary. *Id.* Baum attempted to do so, but because Baum was an insurance agent for New York Life Insurance Company, the issuer of the policy, New York Life refused to issue the policy with Baum as the named beneficiary. Baum therefore changed the beneficiary to Media. *Id.* The supplementary information policy application form stated that Media had been incorporated in Louisiana, although it had not.

Several days thereafter, Cutler and Cook incorporated their own company called "Media Sales and Marketing, Inc." in Texas ("Media Texas"). *Id.* at 1202. Baum was not involved with Media Texas. Baum later claimed that Cook and Cutler had "cut [him] out completely" of ownership in the business in which he had provided much of the capital. *Id.* at 1202-03. Media Texas never issued any stock, never produced any income, and was merely a corporate shell. *Id.*

Interestingly, Cook was "gunned down" twenty minutes after expiration of the insurance policy's contestability period. Both Baum and Media Texas filed claims for the policy benefits. *Id.* at 1203. The value of the policy was far greater than the one year's worth of premium payments received.

because neither of the contesting beneficiaries had an insurable interest. *Id.*[78] The Fifth Circuit reversed, holding there was a material question of fact as to the circumstances of the creation of the insurance policy and designation of beneficiaries. *Id.* at 1204-05.

On remand, the district court again held that Louisiana law controlled, and that none of the contestants had an insurable interest in Cook's life. *Baum*, 700 F.2d at 929-30, 934-35. The Fifth Circuit reversed a second time, and directed the district court to pay the proceeds to Baum. *Id.* at 935. The court of appeals held that Texas contract choice of law analysis applied, and that it favored the application of New York law. *Id.* at 932.[79] Ultimately, on rehearing, the court vacated its own grant of summary judgment awarding the insurance proceeds to Baum. *New York Life Ins. Co. v. Baum* ("*Baum III*"), 707 F.2d 870, 871-72 (5th Cir. 1983). The court adhered to its choice of law ruling reversing the district court on all issues concerning New York Life, but concluded that there were material fact questions that precluded summary judgment for Baum over a Texas shell company controlled by Baum's former business partners, because there was evidence that Baum may have been aware of the incorporation of that entitly. *Id.*[80]

*Baum II*'s holding as to choice of law is not inconsistent with the result the Court reaches in this case. *Baum* involved a typical contract dispute. The insurer sought to avoid payment of death benefits to parties associated with the two potential beneficiaries

---

[78] Specifically, the court held that neither Media nor Media Texas were in legal existence at the time the contract was made, and so therefore neither could have an insurable interest. 617 F.2d at 1203.

[79] According to the Court, under Texas contract and choice of law rules, the insurance policy "contract was made in New York, and was to be substantially performed in that state. *Baum II*, 700 F.2d at 932. The court relied on the insurance policy's contractual provisions that specified "payments by the [insurer] are payable at [its] Home Office in New York City," and that "[p]remiums are payable . . . to the [insurer] at its Home Office [in New York]." *Id.* at 932-33. The court noted that "acceptance of the application and the issuance and mailing of the policy, acts that were essential to the consummation of the contract, occurred in New York." *Id.* The court added that the fact that the policy required that it be sent to "an agent for the unconditional delivery [to the applicant] does not alter the effect of the transaction, which was consummated at the New York headquarters of the [insurance] Company." *Id.*

[80] The court did not disturb its conclusion that New York law applied.

of the insurance contract, who were or claimed to be affiliated in business with the insured. In *Baum*, the insured (Cook) was aware of and consented to the owner's (Baum's or Media's) creation of the life insurance policy in connection with a creditor/debtor relationship among the insured, the owner, and the named beneficiary. *See Baum III*, 707 F.2d at 872. All the real parties in interest participated actively in creation of the contract. The court of appeals employed a traditional contract choice of law analysis, which dictated that the places of contracting and performance were the most significant factors under the facts of the case.

Resolution of insurable interest cases is highly fact specific. The *Baum* circumstances are materially different from Plaintiffs' dispute with Defendants. In the instant case, the insured Plaintiffs were not active participants in creation of the COLI policies. Many Plaintiffs did not even know the insurance had been created.[81] Thus, the place of contracting and payment, the central factors for the Fifth Circuit in *Baum II*, are not dispositive here.[82] Moreover, despite the *Baum* court's detailed rulings, there was no analysis of the numerous other factors important to a full choice of law analysis under the Restatement. Thus, the *Baum* cases do not serve as a helpful guide to this Court, and those rulings do not alter the Court's analysis.

### 3. The Camelot COLI Policies

Hartford and the Camelot Defendants contend that Georgia law applies to the COLI policies that the Camelot Defendants purchased from Mutual, which Hartford

---

[81]   It is clear that the Camelot Plaintiffs had no such knowledge. Wal-Mart relies on putative notice given through a brochure distributed to Wal-Mart employees in December 1993 the "Benefits Brochure." Exhibit 7 to the Emerick Affidavit. The Benefits Brochure did not advise the employees meaningfully of the creation of new insurance on their lives. The brochure's focus and inquiry to the employees pertained to a right to opt out of the $5,000 Special Death Benefit, not a solicitation for the employee's agreement to the creation of the insurance itself.

[82]   Moreover, in *Baum*, the insured/decedent's estate was not a contestant. In *Baum*, the identity of the beneficiaries named in the insurance policies was disputed. Here, the issue is completely different; it is the legal effect of the existence of the policies.

acquired. In support of this contention, Defendant Hartford proffers a sparse affidavit of James Van Etten stating that (i) Camelot intended for Georgia to be the situs of its COLI policies, (ii) Camelot intended for Georgia law to govern its COLI policies, (iii) Mutual used forms for the policies authorized for use in Georgia, and (iv) the COLI policies were administered by a third-party administrator in Georgia.[83]  Hartford further asserts:

> No part of the negotiations related to the Wal-Mart or Camelot COLI policies took place in Texas. No insurance policies were delivered in Texas, no premiums were paid from Texas, no beneficiaries were Texas residents, and no policy benefits were paid in Texas.[84]

Defendant Hartford proffers no other evidence to establish the Camelot COLI policies' contacts with Georgia. The Camelot Defendants introduce no independent evidence.[85]

In response, Plaintiffs argue that testimony in a related action demonstrates that Camelot's COLI policies were not issued or delivered in Georgia. *In re CM Holdings, Inc.*, 254 B.R. 578 (D. Del. 2000).[86]  At issue in *CM Holdings* was whether Camelot's COLI policy scheme was a sham transaction for tax purposes. *Id.* at 583. The Delaware District court did not address the choice of law issue in its opinion. The testimony cited by Plaintiffs involves opinions of an insurance agent that the Camelot COLI policies had

---

[83]  Van Etten Aff. (Attachment A to Appendix for Hartford's Summary Judgment Motion), ¶¶ 8-9.

[84]  Van Etten Aff., ¶ 9.

[85]  *See* Camelot Defendants' Summary Judgment Motion [Doc. # 30], at 2 (incorporating Hartford's submissions by reference).

[86]  *CM Holdings* was a Chapter 11 bankruptcy action involving Camelot's parent company, CM Holdings. 254 B.R. at 582. In the context of the bankruptcy proceeding, the IRS contended that Camelot's COLI policy scheme was an improper tax shelter. *Id.* at 581. The dispute resulted in an adversary proceeding and trial in the United States District Court for the District of Delaware. *Id.* at 582. That court held that Camelot was not entitled to interest deductions associated with the COLI scheme. *Id.* at 583. Plaintiffs have submitted the district court's 82-page opinion and the 1799-page trial transcript. The Camelot Defendants do not cite meaningfully to this material.

close connections to Ohio.[87]  Plaintiffs also cite comments made by the presiding judge in *CM Holdings* during the trial which indicate that the COLI policies were not issued in Georgia.[88]  In rebuttal, the Camelot Defendants argue that even if the testimony in *CM Holdings* case shows that Ohio, rather than Georgia, had more significant contacts with the COLI policies there in issue, Plaintiffs fail because Ohio law does not recognize their cause of action.

Evidence from the tax case is not probative as to the choice of law issue presented here.  Plaintiffs were not parties to those proceedings.  The issues before that court were materially different from those raised here.  The statements and testimony on which Plaintiffs rely were not necessary to and did not form any part of the district court's holding in *CM Holdings*.  Thus, neither Plaintiffs nor Defendants have demonstrated that estoppel should be imposed through application of the Delaware district court's ruling.  The Court has broad discretion to determine whether collateral estoppel should be applied to preclude litigation of an issue.  *Copeland v. Merrill, Lynch & Co. v. America's Favorite Chicken Co..* 47 F.3d 1415, 1423 (5th Cir. 1995); *J.M. Muniz, Inc. v. Mercantile Texas Credit Corp.*, 833 F.2d 541, 543 (5th Cir. 1987).  Collateral estoppel bars the relitigation of an issue of ultimate fact by the party against whom the issue has been determined by a valid and final judgment. *Hibernia Nat'l Bank v. United States*, 740 F.2d

---

[87]  Campisi, an insurance agent involved with the issuance of the COLI policies, testified that the policies had significant contacts to Ohio:

> [T]he application and the prepayment agreement was signed in Ohio.  The first check that was written came from Ohio.  That would indicate that the policies were issued in Ohio.  The policies were physically delivered to Ohio.  And that would indicate that the policies were . . . issued in Ohio.

*IRS v. CM Holdings, Inc.*, Trial Transcript at 1204-06 (Exhibit B of Appendix to Camelot Plaintiffs' Motion for Summary Judgment).  Ultimately, Campisi opined that the COLI policies were issued in Ohio, but Georgia law applied for premium tax purposes. *Id.*

[88]  Judge Schwartz stated: "the policies probably were never in the State of Georgia, but were delivered to corporate headquarters in Ohio." *IRS v. CM Holdings, Inc.*, Trial Transcript at 793 (Exhibit B of Appendix to Camelot Plaintiffs' Motion for Summary Judgment)

382, 387 (5th Cir. 1984). While mutuality of parties is not required, collateral estoppel can only be applied against parties who have had a prior full and fair opportunity to litigate their claims.[89] *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 338 (5th Cir. 1982) (explaining *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)).

The Court engages in an independent choice of law analysis for the Camelot COLI policies and uses the available factual record. The Court finds that virtually no factually specific evidence establishes meaningful contacts between the State of Georgia and Plaintiffs' claims against the Camelot Defendants and Hartford. Nothing in the sample Camelot COLI insurance policy reveals any connection with the State of Georgia. The insurer, Mutual, is listed as having a New Jersey address and other connections to that state as well as Missouri.[90] Premiums paid by the Camelot Defendants were payable at Mutual's home office in New Jersey.[91] Under the heading "Statement of Policy Cost and Benefit Information" the insurance agent is listed with a Florida address.[92] Camelot was a Pennsylvania corporation that was acquired in December 1997 by Trans World, a New York corporation with its principal place of business in New York. Hartford is a Connecticut insurance company with its principal place of business in Connecticut.

The Court also concludes that the State of Texas has a substantial interest and several important contacts with the dispute concerning the Camelot COLI policies. The Court incorporates, to the extent relevant to the Camelot parties, the foregoing analysis of

---

[89]  Collateral estoppel traditionally applies when three conditions are met: (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case. *Hibernia*, 740 F.2d at 387. The Fifth Circuit has recognized a fourth requirement for offensive use of collateral estoppel: whether there is any special circumstance that would make it unfair to apply the doctrine. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir. 1998). These conditions are not met here.

[90]  Exhibit A to Complaint, at DE-CMH00457.

[91]  *Id.* at DE-CMH00464.

[92]  *Id.* at DE-CMH00489.

the Restatement § 6 and § 188(2) factors discussed with respect to Wal-Mart. The Camelot Defendants set up a COLI policy administrator in Georgia that serves a function comparable to the Wal-Mart Trust.[93] The choice of law analysis on the Camelot Plaintiffs' claims therefore is the same as for the Wal-Mart parties' contacts with the State of Texas.

The Restatement § 6 and § 188(2) factors as to the Camelot COLI policies point to Texas as the state with the most significant contacts to the dispute. Although Georgia and the states in which the parties (other than the insureds) are domiciled may have some interest in the dispute, these states' interests pale by comparison to Texas. The Camelot Plaintiffs are or were Texas residents and/or citizens. Their lives are the subject matter of the COLI policies. Material aspects of the performance under those contracts is in Texas. The Texas contacts with this dispute are stronger than the connection of any other state.

Accordingly, the Court holds that the Camelot Defendants' and Hartford's motions for summary judgment are denied insofar as these parties seek to apply Georgia law to Plaintiffs' claims concerning the Camelot COLI policies. The Court further holds that Texas law should apply to the Camelot Plaintiffs' claims against the Camelot Defendants and Hartford.

---

[93] The details of the administrator's role is not established by the parties. The parties have submitted the voluminous records of bankruptcy and tax litigation, but have failed to direct the Court to any specific portions of that record to support their contentions. This Court has no duty to scour this record. *Ragas v. Tennessee Gas and Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Camelot Defendants and Hartford, as movants seeking application of Georgia law, have the duty to establish these facts. The absence of evidence in the record to connect this dispute to Georgia, through the Camelot administrator or otherwise, constitutes a failure by movants to meet their summary judgment burden to demonstrate as a matter of law that Georgia law should apply in this case.

## C.     **Conclusion on Choice of Law**

Having considered all the parties' arguments regarding the choice of law issue, the Court concludes that Georgia law does not apply. Based on the available record, this case is governed by Texas law, including its insurable interest doctrine.[94]

## V.     **CONTENTIONS RELATED TO SIMS ESTATE'S CLAIMS**

### A.     **ERISA Preemption**

Defendant Wal-Mart seeks dismissal of Plaintiff Sims Estate's claim for the COLI death benefits because the claim relates to an ERISA plan and is therefore preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").[95] Wal-Mart relies on the proposition that its COLI policies formed part of its employee benefit plan ("Wal-Mart Plan"). Plaintiffs respond that the COLI policies are unrelated to any part of the Wal-Mart Plan. Plaintiffs further argue that even if the COLI policies

---

[94]     All choice of law arguments made by Defendants that have not been addressed here have been considered by the Court and rejected.

[95]     Plaintiffs plead their claims largely without distinguishing among Plaintiffs or Employer Defendants. By implication, Plaintiffs include the claims of the Sims Estate. Pertinent to Plaintiff Sims Estate and the COLI death benefits, the Complaint requests relief under 28 U.S.C. § 2201(a) including:

> [1]     A final judgment concluding that the policies, policy benefits, and any residual or resulting benefits from the policies are held in a constructive trust by Wal-Mart, Camelot, Trans World, members of the defendant employer class, Hartford or AIG, as appropriate, for the benefit of the plaintiffs and members of the plaintiff-insured person class;
>
> [2]     A final judgment for money identifying the amount held in constructive trust by members of the defendant-employer class; and
>
> [3]     A final judgment disgorging the money unjustly had and received by members of the defendant-employer class through the life insurance policies at issue.

Complaint, at 12-13. In sum, the Sims Estate seeks an order that the COLI death benefits on Sims' life be paid to the Sims Estate.

were related to the Wal-Mart Plan, the Sims Estate's claim is not preempted under the ERISA "savings clause."[96] Alternatively, Plaintiffs contend that they have insufficient factual information on the COLI policies and the Wal-Mart Plan to respond to Wal-Mart's ERISA arguments, and move under Rule 56(f) of the Federal Rules of Civil Procedure for a continuance to pursue additional discovery.[97]

Wal-Mart has failed to demonstrate that the Sims Estate's claim for COLI policy benefits, which became payable after Wal-Mart terminated the Special Death Benefit, is related to Wal-Mart's ERISA plan. The Sims Estate's claim therefore is not preempted.

### 1. Standard for ERISA Preemption

To determine whether a particular plan qualifies as an ERISA plan, the Fifth Circuit asks whether the plan "(1) exists; (2) falls within the safe harbor exclusion established by the Department of Labor; and (3) meets the ERISA requirement of establishment or maintenance by an employer for the purpose of benefitting the plan participants." *McNeil v. Time Ins. Co.*, 205 F.3d 179, 189 (5th Cir. 2000); *Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir. 1993).[98]

---

[96]    29 U.S.C. § 1144(b)(2).

[97]    *See* The Estate of Douglas Sims' Response to Wal-Mart's Motion for Summary Judgment [Doc. # 32], at 16-34 (seeking discovery on Wal-Mart's ERISA preemption argument). This motion is denied as moot. A continuance for the purposes Plaintiffs seek is unnecessary. In this regard, Plaintiffs also submitted the Declaration of Seth J. Chandler, apparently as an expert opinion in support of their arguments against ERISA preemption. Declaration of Seth J. Chandler (Exhibit A to Plaintiffs' November 2, 2001 Submission) ("Chandler Decl."). Defendants object to the Chandler Declaration. *See* Defendant Wal-Mart's Objection to Declaration of Seth J. Chandler [Doc. # 56]; Surreply of Defendants Camelot Music, Inc. and Trans World Entertainment Corporation in Opposition to Camelot Plaintiffs' Motion for Partial Summary Judgment [Docs. # 54], at 6; Hartford Life Insurance Company's Surreply in Opposition to the Camelot Plaintiffs' Motion for Partial Summary Judgment and Objection to the Declaration of Seth J. Chandler [Doc. # 55], at 2-5. The Court does not rely on the Chandler Declaration in reaching its decision, and thus Defendants' objections are denied as moot.

[98]    Under the first step in the Fifth Circuit's test, an ERISA plan is said to exist if a court can determine "from the surrounding circumstances [that] a reasonable person could ascertain
                                                                                              (continued...)

ERISA preempts "any and all State laws insofar as they now or hereafter relate to an employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has held that the term "relate to" should be expansively construed. *FMC Corp. v. Holliday*, 498 U.S. 52, 57-58 (1990) ("The preemption clause is conspicuous for its breadth. It establishes as an area of exclusive federal concern the subject of every state law that 'relates to' an employee benefit plan governed by ERISA.").

Applying these principles, the Fifth Circuit has found generally that ERISA preempts state law claims in two situations: "(1) the claim addresses areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationship among the traditional ERISA entities – *i.e.*, the employer, plan administrators, fiduciaries, participants, and beneficiaries." *Bullock v. The Equitable Life Assurance Society*, 259 F.3d 395, 399 (5th Cir. 2001); *Cypress Fairbanks Med. Ctr., Inc. v. Pan-American Life Ins. Co.*, 110 F.3d 280, 283 (5th Cir. 1997).

However, some state law claims may affect an ERISA plan in a manner that is too tenuous, remote, or peripheral to warrant a finding that the law "relates to" the plan. *Nickel v. Estate of Estes*, 122 F.3d 294, 297 (5th Cir. 1997). For example, in certain circumstances a plaintiff may refer to plan benefits as a measure of damages without invoking ERISA preemption. *Rozzell v. Security Serv., Inc.*, 38 F.3d 819, 822 (5th Cir. 1994). In order to determine whether a state law claim is preempted by ERISA, the

---

[98]   (...continued)
the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Meredith*, 980 F.2d at 355. Under the second step, a plan is exempt from ERISA's purview if "(1) the employer does not contribute to the plan; (2) participation is voluntary; (3) the employer's role is limited to collecting premiums and remitting them to the insurer, *and* (4) the employer received no profit from the plan." *Id.* (emphasis in original). The plan must meet all four criteria established by the Department of Labor to be exempt. *Id.* Under the third and final step the Fifth Circuit looks to the two primary elements of an employee benefit plan as defined by the statute: "(1) whether an employer established or maintained the plan; and (2) whether the employer intended to provide benefits to its employees." *Id.*

Court must look past the words in the complaint and consider the substance of the claim alleged. *Id.* The Fifth Circuit takes a fact-sensitive approach when making a preemption determination. *E.g., Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 246 (5th Cir. 1990) (examining the "commercial realities" of plaintiff's position as part of ERISA preemption analysis).

## 2. Relatedness to Wal-Mart's ERISA Plan

Starting in December 1993, Wal-Mart offered a $5,000 Special Death Benefit to all employees covered by a Wal-Mart medical plan during 1994 to 1995.[99] The Special Death Benefits were payable to the same beneficiary as the *employee selected* under non-COLI life insurance policies that Wal-Mart bought for its employees through the Wal-Mart Plan.[100] The Special Death Benefits were described in the Summary Plan Descriptions ("Summaries") issued by Wal-Mart to its employees for the years 1994 and 1995.[101] The section regarding the Special Death Benefits in each of the Summaries makes no reference to the COLI policies. Instead, each says that the "special death

---

[99] Emerick Aff., ¶ 4, and Exhibit 7. If the employee died as a result of an accident, the payment was $10,000. *Id.*

[100] *See* 1994 Summary Plan Description (Exhibit 1 to Emerick Aff.) ("1994 Summary"); 1995 Summary Plan Description (Exhibit 2 to Emerick Aff.) ("1995 Summary"). These documents are collectively referred to as the "Summaries." The non-COLI life insurance policies were purchased by Wal-Mart and offered to its employees. These polices are called "company-paid life insurance," as distinct from the COLI ("company-owned life insurance") policies in issue before the Court. *See* Emerick Aff., ¶¶ 3-5. Under the company-paid insurance program, the employees designated the beneficiaries of the insurance proceeds. *Id.* The company-paid life insurance paid benefits equal to the employee's yearly salary up to $50,000. *Id.* Under the COLI policies, Wal-Mart designated itself as the beneficiary of all the insurance on all the employees' lives. Only the COLI polices are alleged to be related to the Special Death Benefits. Wal-Mart described both these types of life insurance policies in the same section of the Wal-Mart Plan's Summaries. It is not unlikely that a reader of the Summaries would be confused about the differences between these types of insurance and fail to recognize the distinction between them.

[101] The language describing the Special Death Benefits in the 1994 and 1995 Summaries is nearly identical. *See* 1994 Summary, at F-2; 1995 Summary, at F-2. Each Summary also states "[a]lthough this special death benefit is expected to continue indefinitely, Wal-Mart reserves the right to change or discontinue these benefits at any time." *Id.*

benefit is *fully paid by Wal-Mart.*"[102]  Wal-Mart nevertheless asserts, on the basis of the affidavit of Tom Emerick, Wal-Mart's Vice President of Benefits, that the Special Death Benefits were "funded" by the COLI policies.[103]  Besides Emerick's conclusory statement, the sole evidence submitted in support of this assertion is Memorandum dated December 14, 1993 ("Benefits Memorandum") and the accompanying brochure ("Benefits Brochure") announcing the initiation of the Special Death Benefit program in December 1993.[104]  The Benefits Brochure was not a formal ERISA mandated document among the "controlling Wal-Mart Plan documents."[105]

The Benefits Memorandum stated that the "new benefit is being implemented because of financial benefits associated with a Wal-Mart owned life insurance program which is explained in the enclosed [Benefits Brochure]."[106]  The Benefits Brochure stated:

> Wal-Mart is providing these new death benefits as a result of financial gains from life insurance policies Wal-Mart will purchase which will cover the lives of associates who participate in the group health plan.  That Wal-Mart owned life insurance will result in the financial benefits for the corporation. Any net life insurance proceeds payable to Wal-Mart from this life

---

[102]  Summaries, at F-2 (emphasis added).  There is nothing in the Summaries or other formal written Wal-Mart Plan documentation before the Court that *requires* Wal-Marts to pay a portion of the specific proceeds of a COLI policy, in particular, to the deceased employee's designated beneficiary, or that otherwise commits Wal-Mart to use any specific source of funds for the Special Death Benefits.

[103]  Emerick Aff., ¶ 5.

[104]  Exhibit 7 to Emerick Aff., and ¶¶ 3-5 thereto.  Exhibit 7 consists of three unnumbered pages. The Court will refer to these unnumbered pages by their location in the Exhibit.

[105]  Emerick describes the controlling Wal-Mart Plan documents as being "Exhibits 1 through 6" of the Emerick Affidavit, Emerick Supp. Aff., ¶ 3, and states "there were no other legal documents that defined COLI benefits under the [1994 or 1995 Summaries].  In fact, the [Summaries] constitute the plan text that define the COLI benefits under the Wal-Mart Plan and there is no separate 'legal document' that does so."  *Id.*

[106]  *Id.*

insurance as a result of the death of an active associate will be contributed to the profit sharing plan.[107]

The Benefits Brochure established, at best, that the "Wal-Mart owned life insurance" is "payable to *Wal-Mart*," and that Wal-Mart elected to pay the Special Death Benefit under the Wal-Mart Plan.[108] Thus, there is no documentary evidence that demonstrates that the proceeds of the COLI policies *per se* were paid into the Wal-Mart ERISA Plan. At best, Wal-Mart's evidence creates a fact issue as to how the Special Death Benefit actually was funded.

If the Court, nevertheless, assumes that Wal-Mart's commitment to pay the Special Death Benefit causes the COLI policies to be a part of the Wal-Mart Plan, Wal-Mart's ERISA preemption contentions about the Sims Estate's claim still fail. First and foremost, the Sims Estate does not seek recovery of the Special Death Benefits or any other Wal-Mart Plan benefits. The Sims Estate seeks to recover the COLI policy

---

[107]   *Id.*, at 3. The Benefits Brochure also stated that the "details of this new death benefit will be explained in the Benefits Book" which presumably refers to one of the Summaries. The Benefits Brochure gave Wal-Mart employees an opportunity to opt out of the Special Death Benefits program. Emerick states that it "was Wal-Mart's intention and policy that the Trust not purchase a COLI policy on the life of any Wal-Mart employee who signed the opt-out form." Second Supp. Emerick Aff., ¶ 4. Emerick further states: "COLI policies were not purchased by the Trust on employees who signed the opt-out form, unless an administrative error occurred whereby a particular COLI policy might have been mistakenly purchased by the Trust of which I am aware." *Id.* It is not clear if Sims is the only Wal-Mart employee that became eligible for the Special Death Benefit. His estate makes the only claim for death benefits presently before the Court. Plaintiffs move conditionally, if this Court denies their Rule 56(f) motion for continuance, to strike the Second Supplemental Emerick Affidavit or to take Emerick's deposition. *See* Plaintiffs' Motion to Strike, Response to Wal-Mart's Supplemental Brief in Support of Motions for Summary Judgment, Supplemental Motion for Continuance and Leave to Depose Tom Emerick [Doc. # 85]. Plaintiffs argue that this third Emerick affidavit is untimely. The motion is denied. The parties were invited at the January 11, 2002 hearing to submit supplemental materials on the topics addressed by this affidavit.

[108]   *Id.* (emphasis added). The parties agree that the Benefits Brochure's reference to the Wal-Mart "profit sharing plan" is not pertinent to the issues before the Court. January 11, 2000 Transcript, at 8-9, 21-23.

proceeds as the lawful beneficiary under Texas insurable interest doctrine.[109]   The Sims

Estate's claim has no bearing on the Plan or its administration.[110]   The Sims Estate's claim

does not relate to the Wal-Mart ERISA  plan.[111]

This result is bolstered by the cases on which Wal-Mart relies. In *Lee v. E.I.
DuPont de Nemours and Co.*, 894 F.2d 755 (5th Cir. 1990), the plaintiffs sought "to
recover benefits defined by their former employer's ERISA plan, benefits to which they
would have become entitled but for an alleged misrepresentation by their employer,
during their employment, on which they relied to their detriment." *Lee*, 894 F.2d at 757.
Plaintiffs alleged state law claims of fraud and negligent misrepresentation for which they
sought to recover specifically the additional monthly retirement benefits they would have
received if they had retired under the new retirement program. *Id.* at 756.   The Fifth
Circuit held preemption applied since the plaintiffs' putative state law fraud claims
"relate[] to their former employer's pension plan and interfere[] with the exclusively

---

[109]   Wal-Mart, relying upon several federal district court cases, contends that Plaintiffs seek
recovery on a claim for violation of public policy and that Texas does not recognize a
separate tort for the violation of public policy, citing *Guzman v. El Paso Natural Gas Co.*,
756 F. Supp. 994, 1002 (W.D. Tex. 1990); *Andrews Transport, Inc. v. CAN Reinsurance
CO., Ltd.,* 166 F. Supp. 2d 516, 523-24 (N.D. Tex. 2001).  Wal-Mart argues that the Sims
Estate's claim must be one for unjust enrichment.  Plaintiffs point out that they do not allege
a tort , and do not seek tort damages. Thus, these cases are not relevant to the ERISA analysis
or otherwise.

[110]   Undoubtedly, one reason the Sims Estate does not seek any benefits provided by the Wal-
Mart Plan is that the Estate recognizes that it does not qualify for those benefits. The Special
Death Benefit program was closed to new enrollees in 1995, and completely discontinued
months before Sims's death in 1998. *See* Emerick Aff., ¶ 6.

[111]   The outcome is logical. ERISA and the Texas insurable interest doctrine are motivated by
substantially different policy concerns.  Congress enacted the ERISA statutory scheme as a
means of protecting the rights of "working men and women from abuses in the
administration and investment of private retirement plans and employee welfare plans."
*Hansen v. Continental Ins. Co.*, 940 F.2d 971, 975-76 (5th Cir. 1991). By contrast, the Texas
insurable interest doctrine has the following policy concerns: (i) preventing a person from
having an incentive to commit murder, and (ii) prohibiting wagers on the life of another.
*Stillwagoner*, 979 S.W.2d at 358.

federal regulatory scheme." *Id.* at 758.[112]  The Court of Appeals in *Lee* relied on *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290 (5th Cir. 1989), also cited by Wal-Mart.  In *Cefalu*, a former employee sued to recover additional plan benefits based on an alleged oral contract.  871 F.2d at 1291.  The Fifth Circuit held that the plaintiffs' claim was related to an ERISA plan and preempted because plaintiff's damages "would consist of the pension benefits he would have received had he been employed [by the successor entity]." *Id.* at 1294.

The *Lee* and *Cefalu* cases are clearly distinguishable from the matters at bar.  In each case, the plaintiffs plainly sought policy benefits to which they would have been entitled but for their reliance on their respective employer's alleged misrepresentations.  These were claims to recover benefits under an ERISA plan.  In the case at bar, however, the Sims Estate seeks to recover nothing under the terms of the Wal-Mart Plan.  Indeed, the Special Death Benefit is entirely irrelevant to the Sims Estate's claim relating to the COLI policy insuring Douglas Sims.  The COLI policy was owned and its benefits were payable to Wal-Mart through the Wal-Mart Trust, not the Wal-Mart plan.

Wal-Mart's arguments regarding ERISA preemption therefore fail.  The Sims Estate's claims for the COLI policy benefits are not related to an ERISA plan.  Therefore, the Court need not reach the parties' arguments regarding the ERISA savings clause.  Wal-Mart's Summary Judgment Motion claiming ERISA preemption is denied.

### B.   Statute of Limitations

Defendant AIG argues that the Sims Estate's claim is barred by the statute of limitations.[113]  In response, the Sims Estate argues that its claim is not barred because that claim did not accrue until death benefits were paid from the Wal-Mart COLI policy on

---

[112]   The Court of Appeals explained that "the Plaintiffs' action would impose a state-created duty to disclose plan amendments before they are put into effect, a duty which . . . ERISA specifically does *not* impose." *Id.* at 758 (emphasis in original).

[113]   *See* AIG's Summary Judgment Motion [Doc. # 60], at 5-8.  Wal-Mart and the Wal-Mart Trust have adopted AIG's statute of limitations argument. *See* Wal-Mart Trust's Summary Judgment Motion [Doc. # 58], at 1-2.

Sims's life. After reviewing the pertinent authorities,[114] the Court concludes that the Sims Estate's claim has been asserted timely.

### 1.    Length of Limitations Period

AIG argues that the longest possible limitations period applicable to the Sims Estate's claim is four years, since the Sims Estate seeks a constructive trust. AIG argues that the majority rule in Texas is to apply the residual four year limitations period to claims for a constructive trust. Tex. Civ. Prac. & Rem. Code § 16.051 ("Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues."). The minority rule, according to AIG, is that courts apply the limitations period of the underlying claim in actions for a constructive trust. Under the latter rule, the limitations period would be either two or four years, depending on how the Sims Estate's claim is characterized.[115]

The Court concludes that the applicable limitations period is four years, whether § 16.051 governs or the limitations period governing the underlying claim applies. All Defendants in this action, including AIG, which incorporates the other Defendants' arguments by reference, characterize this case as a contract action for choice of law

---

[114]   AIG bases its statute of limitations arguments on Texas law, contending that Texas courts characterize limitations issues as procedural and thus apply the law of the forum, irrespective of which law applies to the merits of the dispute. Whether the limitations issue is substantive or procedural is academic since the Court has held that Texas law governs the merits of this case. Therefore, Texas law will be applied to the limitations issue.

[115]   After reviewing the authorities cited by AIG, the Court questions the characterization of the majority and minority rules. For example, in *Brupbacher v. Raneri*, Civ.A. No. 3:98-CV-1174, 2000 WL 665560, *4 (N.D. Tex., Mar. 17, 2000), cited by AIG in support of its articulation of the "majority rule," the district court looked to the underlying cause of action in determining the limitations period. The court stated: "In actions to establish a constructive trust *based on fraud*, the four-year statute of limitations applies." *Id.* (emphasis added). The court in *Brupbacher* did not cite or otherwise refer to the residual statute of limitations. In *Carr v. Weiss*, 984 S.W.2d 753, 762 (Tex. App.–Amarillo 1999, pet. denied), cited by AIG, the court did not hold that constructive trust suits are governed automatically by the residual limitations period.

purposes. In Texas, the limitations period for contract actions is four years. TEX. CIV. PRAC. & REM. Code § 16.004(a)(3) (Vernon Supp. 2001); *Morris v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 869 (Tex. App.–San Antonio 1997, no writ). Alternatively, Wal-Mart characterizes this case as one for unjust enrichment in its ERISA preemption argument. The Texas statute of limitations for unjust enrichment action is four years. TEX. CIV. PRAC. & REM. CODE §16.004(a)(3) (Vernon Supp. 2001); *Amoco Production Co v. Smith*, 946 S.W.2d 162, 164-165 (Tex. App.–El Paso 1997, no pet.).[116]

Accordingly, the Court holds that the Sims Estate's cause of action is subject to a four year statute of limitations.

### 2.    Accrual of the Sims Estate's Claim

AIG argues that the four year limitations period began when the Sims Policy was issued in 1993. AIG contends that Plaintiffs concede through their allegations in the Complaint, that their claims for constructive trust accrued when the COLI policies were issued. AIG deduces that the limitations period began to run on the Sims Estate's claim when the COLI policies were issued in 1993, more than four years before commencement of this lawsuit, and thus the Sims Estate's claim is time-barred.

In response, the Sims Estate attempts to distinguish its claim from those of the Camelot Plaintiffs, who are live individual insureds seeking ownership of the COLI policies currently in force. The Sims Estate argues that it seeks a constructive trust on the death benefits of the COLI policy on Sims's life, a cause of action that did not accrue until Sims died. Furthermore, the Sims Estate argues that it could not have brought that claim until Sims died since the estate did not exist until Sims death.

---

[116]    Plaintiffs appear to take the position that the limitations period is four years. Plaintiffs' arguments focus on the dates their claims accrue.

The Court is not persuaded by AIG's or the Sims Estate's arguments.[117]  Plaintiffs all seek declarations that the Employer Defendants lack an insurable interest in their lives and that Plaintiffs are the "lawful owners of the . . . COLI policies insuring their lives, . . . ."[118]  The fact that the estate of a deceased individual may seek the additional relief of a constructive trust on death benefits under the insurance policy does not alter the underpinning of all Plaintiffs' claims.  In order to determine the timeliness of the Sims Estate's claim, the Court must determine when Sims's cause of action for declaratory relief accrued.  If Sims's individual claim for declaratory relief was time barred while he was alive, then his estate's claim on the same theory would also be barred.  *Russell v. Ingersoll-Rand Co.,* 841 S.W.2d 343, 345 (Tex. 1992).

The Court concludes as to Sims and his estate that the claim for declaratory judgment as to the existence of Wal-Mart's insurable interest accrued each day that the questioned COLI policy insuring Sims was in force.  The "State of Texas has established a fixed policy with reference to its own citizens, by and through which it refuses to permit one who has no insurable interest in a living person to be and become the beneficiary in an insurance policy written on the life of such living person."  *Cole,* 187 S.W.2d at 593

---

[117]  Plaintiffs in the Complaint make no distinction between the claims of the live Plaintiffs and the Sims's Estate's claim.  The Complaint states:

> Under well-established Texas law, when a life insurance policy erroneously names a beneficiary that does not possess an insurable interest in the life of the person insured, the designation is void.  By operation of Texas law, the policy remains in place and is owned by the insured person, and upon his death, the benefits are payable to the insured person's estate.  The insurer or designated beneficiary will hold the policy or policy benefits, as applicable, in a constructive trust for the insured person or his estate, as applicable, when the designated beneficiary has no insurable interest in the insured person's life.

Complaint, at 9.  Under Plaintiffs' theory, Sims could have sued for a constructive trust from the moment the COLI policy on his life was purchased.

[118]  Complaint, at 12.  Plaintiffs further seek a final judgment that the "policies, policy benefits and any residual or resulting benefits from the policies are held in a constructive trust by [the Employer Defendants]. . . ."  *Id.*

(citing *Cheeves*, 28 SW. 274). The violation of this Texas legal doctrine is not restricted to the day Wal-Mart contracted for or obtained the allegedly improper interest as the beneficiary of the Sims Policy.[119]

It would undermine the public policy of Texas embodied in its insurable interest doctrine to preclude an insured or his heirs from protecting his and the estate's interests in avoiding incentives for the murder of or wagers on an insured's life, merely because the insured failed to perceive the legal importance of, or to act on, knowledge of the existence of the improper beneficiary designation. No Texas decisions on the insurable interest doctrine have considered the timing of the filing of the suit vis à vis the naming of a beneficiary that lacks an insurable interest, or vis à vis the occurrence of facts that result in a beneficiary lacking an insurable interest.[120] AIG's contentions would add an unnecessary layer of uncertainty to enforcement of the prophylactic Texas insurable interest doctrine. The insured suffers the same risks and the Texas doctrine is violated irrespective of whether the improper beneficiary was named with or without the knowledge of the insured, and irrespective of when the improper relationship was created.

---

[119]    For this reason, the Court rejects AIG's further argument that the discovery rule should apply. AIG reasons that Sims was placed on notice of the existence of the COLI policies through the Benefits Brochure distributed in December 1993. AIG contends that Sims thus is charged with knowledge of the violation of Texas public policy from that time forward and his Estate's claim is therefore time-barred. This argument presumes that the violation of Texas law occurs solely through the policy owner's entry into an offending insurance contract, a theory this Court rejects in the accompanying text. There appears no policy or legal reason to allow an owner of an offending insurance contract to avoid the Texas insurable interest doctrine merely because the insured at some time became, or should have become, aware of the existence of the legally improper beneficiary designation. Indeed, the parties cite no cases on insurable interests in which the insured's knowledge of the offending beneficiary designation was legally significant.

[120]    *See, e.g., DeLeon*, 259 F.3d 344 (administrator of deceased employee's estate brought action to recover benefits of COLI policies); *Cheeves v. Anders*, 28 S.W. 274 (administrator of insured's estate brought action against policy beneficiary for death benefits); *Tamez*, 999 S.W.2d 12 (administrators of employees' estates brought action to recover benefits of COLI policies).

The Sims Estate filed its claim for declaratory relief within four years of Wal-Mart's termination of the Sims COLI Policy. As to the death benefits, the Sims Estate claim was filed less than four years from Sims's death. Thus, the Sims Estate's claims for declaratory judgment and for constructive trust over the policy proceeds are timely.

### C.   AIG's Motion to Dismiss

#### (i)   Overview and Applicable Legal Standards

AIG seeks dismissal of Plaintiff Sims Estate's claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that the Sims Estate has failed in the Complaint to state a claim against it upon which relief may be granted.[121] This motion is granted without prejudice to Plaintiffs to replead, since there has been no discovery in this case and the authorities on which the Sims Estate and other Plaintiffs base their claim require a fact specific analysis. From the Complaint, it appears that the Sims Estate's claim is primarily against Wal-Mart, an Employer Defendant. The Complaint contains no specific allegations of wrongful or inequitable conduct *by AIG* against Sims or his estate in particular.      In reviewing a Rule 12(b)(6) motion, the Court must accept as true all well-pled allegations, resolving all doubts in favor of the complainants. *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir.1988). Motions "to dismiss for failure to state a claim [are] viewed with disfavor, and [are] rarely granted." *Southern Christian Leadership Conference v. Supreme Court of State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (internal quotation marks and citations omitted). The Court must construe pleadings in an expansive and deferential way at this stage of a suit. *Id.* The Court may dismiss the Sims Estate's claim against AIG only if it has shown "beyond doubt that the plaintiff can prove no set of facts in support of his claim which

---

[121]   *See* AIG's Motion to Dismiss [Doc. # 59]. At the January 11, 2002 Hearing, the Court gave notice that it intended to convert, pursuant to Rule 12(b), motions to dismiss to motions for summary judgment, as appropriate. January 11, 2001 Transcript, at 4-5. Although the parties may have referred to certain limited matters outside the pleadings in connection with AIG's motion to dismiss, it is unnecessary and inappropriate to convert AIG's motion for summary judgment at this early stage since no discovery has occurred as to AIG's alleged payment of the Sims Policy death benefits.

would entitled him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Southern Christian Leadership Conf.*, 252 F.3d at 786 (5th Cir. 2001).

## 2. Allegations in the Complaint

Plaintiffs allege that Wal-Mart purchased approximately 278,558 COLI policies from AIG, pursuant to a "scheme" by which Wal-Mart insured the lives of its employees, including many Texas citizens.[122] Plaintiffs allege generally that certain employers "bought COLI policies, not to insure against the loss of a key employee, which was a lawful and well-established practice in the insurance industry, but as an investment and as a means to improperly avoid federal income tax liability."[123] According to Plaintiffs,

> the corporate employer insured the lives of a vast number of its employees without its employees' knowledge or consent. Generally, the corporate employer borrowed money from the insurer to pay the premiums, claiming a tax deduction for the often exorbitant interest it paid. Upon the death of a covered employee, the insurer paid the corporate employer the death benefit, which the corporate employer claimed as tax-free. The corporate employer would then use some of the death benefit to repay the premium loans.[124]

Plaintiffs further allege that Douglas Sims was employed by Wal-Mart from 1987 until 1998, when he died.[125] He was insured by one of the COLI policies purchased by Wal-Mart from AIG, and he allegedly never consented to this insurance or to the designation of Wal-Mart as the policy beneficiary.[126] Plaintiffs, on behalf of the Sims Estate, allege that Wal-Mart never had an insurable interest in Sims's life,[127] but AIG paid Wal-Mart the

---

[122]  Complaint, at 6.

[123]  *Id.*, at 3.

[124]  *Id.*, at 4.

[125]  *Id.*, at 7.

[126]  *Id.*, at 7.

[127]  *Id.*, at 9.

death benefits under the COLI policy after Sims's death.[128]   On the basis of these factual allegations, Plaintiffs claim generally that the Employer Defendants hold the COLI policies and all their benefits in constructive trust for the benefit of the Texas citizen-insureds,[129] that the Employer Defendants have been unjustly enriched,[130] and that the Employers that bought COLI policies have unclean hands.[131]

### 3.    Analysis

Initially, the Court finds that Plaintiffs have failed in their Complaint specifically to allege that AIG has committed a wrong against the Sims Estate or has been unjustly enriched by the sale of the Sims Policy to Wal-Mart.  Thus, AIG's motion has merit and will be granted.  However, Plaintiffs are granted leave to amend the Sims Estate's claim, should they insist on doing so.  This result is in the interest of justice since Plaintiffs describe in oral argument one or more theories against AIG that are not specifically pleaded.[132]

Leave to amend also is necessary because the Court cannot conclude definitively, as a matter of law, that the Sims Estate cannot state a claim on which relief can be granted against AIG.  AIG in support of its Motion to Dismiss argues that the Sims Estate's claim is unsustainable because the rule articulated in *DeLeon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344, 350-53 (5th Cir. 2001), prohibits double recovery from insurers under the insurable interest doctrine.  According to AIG, *DeLeon* stands for the proposition that an insurer is relieved from all liability once it pays death benefits to the

---

[128]   *Id.*, at 7.

[129]   *Id.*, at 9.

[130]   *Id.*, at 9-10.

[131]   *Id.*, at 10.

[132]   Plaintiffs' Complaint does request relief against the insurers generally through a final judgment concluding that the policies, policy benefits and "other residual or resulting benefits from the policies are held in constructive trust" by "members of the defendant-employer class, Hartford or AIG, as appropriate, for the benefit of the plaintiffs. . .."  *Id.*, at 12.  Thus, Plaintiffs' intentions are not clear as to the Insurer Defendants.

named beneficiary, and thus the appropriate remedy is for the estate to seek the death benefits from the beneficiary through a constructive trust. In addition, AIG argues that the Sims Estate cannot state a claim against it for unjust enrichment and that it was not unjustly enriched at the expense of the Sims Estate.

The Sims Estate responds by citing several cases in which Texas courts allowed a deceased insured's estate to recover death benefits from an insurer which already had paid death benefits to a beneficiary. *See Manhattan Life Ins. Co. v. Cohen*, 139 S.W. 51 (Tex. Civ. App.–San Antonio 1911, writ ref'd), and *National Life & Accident Ins. Co. v. French*, 144 S.W.2d 653 (Tex. Civ. App.–Amarillo 1940, no writ). While it is highly unlikely that the Sims Estate can prevail on any claim based on these cases, the Court cannot conclude as a matter of law that the Sims Estate has no legal claim against AIG.[133]

The first of these cases, *Cohen*, involved unique circumstances that made rote application of other Texas authority inappropriate. In *Cohen*, the estate of the deceased insured sued the insurance company that paid death benefits to an assignee who did not have an insurable interest in the life of the insured.[134] The trial court awarded death benefits to the estate. The court of civil appeals affirmed. In doing so, the appeals court focused on two facts as justifying an exception to the general rule: (i) the insurer's knowledge of the estate's claim at the time it paid the death benefits to Hilsman, and (ii) the indemnity bond given by Hilsman to the insurer.[135] The court's reliance on the

---

[133] The Court's rulings *infra* also undercut the viability of any claim by the Sims Estate against AIG, assuming AIG has in fact paid the death benefits to Wal-Mart.

[134] In *Cohen*, the insured assigned the benefits of a life insurance policy on his life to J.H. Hilsman. 139 S.W. at 52. When the insured died, both Hilsman and the insured's estate ("estate") filed claims with the insurer for the death benefits. *Id.* at 53. Hilsman gave the insurer an indemnity bond in exchange for which the insurer paid him the death benefits. *Id.* Before paying the death benefits to Hilsman, the insurer had notice that the estate claimed that the assignment to Hilsman was invalid. *Id.*

[135] The *Cohen* court conducted a fact-sensitive review of the behavior of the insurance company before determining whether the company had engaged in inequitable conduct. Because the court found that the insurer's "hands are not clean, for they have given to one money to keep
(continued...)

insurer's indemnification agreement with Hilsman, the original recipient of the benefits, suggests that the court did not intend the insurer to have to bear the expense of the benefits twice. It is noted that *Cohen*, which was decided long before seminal insurable interest cases in Texas,[136] has been cited only once for the proposition on which Plaintiffs attempt to rely. Specifically, in *Stillwagoner*, the Tyler Court of Appeals stated in *dicta* without any analysis: "If the insurance company with knowledge of the estate's adverse claim and the reasons therefore pays proceeds benefits to a beneficiary without an insurable interest this can afford no defense to the action by the estate of the insured for the entire amount due on the policies." *Stillwagoner v. Travelers Ins. Co.*, 979 S.W.2d 354, 358 (Tex. App.- Tyler 1998, no pet.).

Plaintiffs also rely on *French*, 144 S.W.2d 1053 (Tex. Civ. App.–Amarillo 1940, no writ), a case decided in 1940, in which the Amarillo Court of Civil Appeals affirmed the trial court's holding that an insurer was liable to a deceased insured's estate for $125 in death benefits after the insurer already had paid these benefits to the named beneficiary who did not have an insurable interest in the insured's life under Texas law. It appears that the insurer did not have notice of the estate's claim when it originally paid the death

---

[135]    (...continued)
which it knew was not his, but another's," it directed recovery from the insurer. *Cohen*, 139 S.W. at 57. The court focused on the unique circumstances of the case, stating:

> Since the insurance company took indemnity from Hilsman for the wrong done the [estate], and is now defending this suit in his interest, rather than its own, it must be regarded as standing in his shoes, and it can no more be heard to say that it had the right to pay the money to him than he could, were he before the court defending this action.

*Id.*

[136]    *See, e.g., DeLeon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344, 350 (5th Cir. 2001); *Griffin v. McCoach*, 123 F.2d 550, 551 (5th Cir. 1941); *Drane v. Jefferson Standard Life Ins. Co.*, 161 S.W.2d 1057, 1058-59 (1942); *Cheeves v. Anders*, 28 S.W. 274, 275 (1894); *Tamez v. Certain Underwriters at Lloyd's, London, International Accident Facilities*, 999 S.W.2d 12, 16-17 (Tex. App.–Houston [14th Dist.] 1999, pet. denied); *Stillwagoner v. Travelers Ins. Co.*, 979 S.W.2d 354, 360-61 (Tex. App.–Tyler 1998, no pet.); *Cole v. Browning*, 187 S.W.2d 588, 593 (Tex. Civ. App.–Ft. Worth 1945, writ ref'd w.o.m.).

benefits. However, significantly, there is no indication that the insurer raised the prior payment as a defense. Also, in *French*, the named beneficiary paid many of the premiums (which were a mere twenty-five cents per month), and thus had some equitable claim to at least some of the death benefits.[137] Moreover, the *French* decision has not been cited by any Texas or other courts as reliable precedent.

At best, the cited cases demonstrate that Texas courts might, in certain highly unusual situations, when necessary to do equity, hold an insurer liable for death benefits to the estate of an insured even if the insurer already has paid the benefits to the named beneficiary.[138] It is far from clear that Plaintiffs can allege the necessary circumstances in this case. Wal-Mart appears to be financially viable, there is no indication of any indemnification agreement between Wal-Mart and AIG, and there is no evidence or allegation that AIG knew of the Sims Estate's claim to the policy proceeds when it paid

---

[137]  Another equitable factor was the gross inequality of wealth of the parties. It appears that the insured's estate likely would have had no remedy but for this ruling.

[138]  The Sims Estate also cites *McDonald v. McDonald*, 632 S.W.2d 636 (Tex. App.–Dallas, 1982, writ ref'd n.r.e.), but this case is inapplicable to the facts at bar. In *McDonald*, the Dallas court of appeals, reversing the decision of the trial court, held that the insurance company was liable to the insured's estate after it had paid death benefits to the insured's former wife, who was the designated beneficiary of the life insurance policy. *McDonald*, 632 S.W.2d at 637. However, the insurable interest doctrine was not mentioned by the court, and apparently was not raised by the parties. Instead, the court framed the issue as "whether the divorce decree [between the insured and his former wife] divested the wife of her contingent right to the insurance proceeds on maturity of the policies by the death of the insured." *Id*. The divorce decree, issued shortly before the insured died, expressly awarded "as [the insured's] sole and separate property, specific items, including, 'any and all insurance, pensions, retirement benefits, and other benefits arising out of [the insured's] employment." *Id*. The insured died before changing the policy beneficiary. *Id*. at 637-38. The issue regarding the insurance company's liability to the estate was whether it had received notice of the estate's claim for policy benefits. *Id*. at 639. The court found that the insurer had sufficient notice of the estate's claim to support liability. *Id*. at 639-40.

them to Wal-Mart.[139]   In sum, the Sims Estate's claim against AIG rests on an exceedingly slim reed.

Nevertheless, at this early stage in the proceedings, the Court is constrained to permit an amendment of the Complaint, if the Sims Estate insists, in light of the fact-sensitive inquiry required by *Cohen*. It is not "beyond doubt" that the Sims Estate can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Southern Christian Leadership Conf. v. Supreme Court of Louisiana*, 252 F.3d 781, 786 (5th Cir. 2001). Therefore, the Court grants the Sims Estate the opportunity to replead its claim against AIG, subject to the admonishment that Plaintiffs are not to reargue matters addressed comprehensively in this Opinion. *See also infra* Section VI.B.2.[140]

---

[139]   AIG argues that there is no evidence, or even any contention, by Plaintiffs that AIG was notified of the Sims Estate's claims to the proceeds of Sims Policy "until long after AIG had already paid the benefits due under the policy." Defendant AIG Life Insurance Company's Reply in Further Support of its Motion to Dismiss the Second Amended Complaint [Doc. # 73], at 4. The Sims Estate *argues* in response that "AIG knew facts putting it on notice that one other than Wal-Mart was properly entitled to the policy benefits because Wal-Mart had no insurable interest in its employees' lives." The Estate of Douglas Sims' Response to AIG Life Insurance Company's Motion to Dismiss [Doc. # 64], at 6. However, the Complaint is silent on this issue. Plaintiffs never expressly allege in the Complaint that any of the Insurer Defendants were aware that the Employer Defendants lacked an insurable interests in Plaintiffs' lives. The Sims Estate unconvincingly relies on paragraph 38 of the Complaint for its argument that AIG had knowledge that Wal-Mart was not entitled to the COLI policy benefits on Sims's life. However, paragraph 38 of the Complaint alleges only that the Defendant employers did not have insurable interests in Plaintiffs' lives. Paragraph 38 does not expressly address the Defendant insurers' knowledge of this fact.

[140]   This Court is also aware of Texas cases involving requests for a constructive trust based on unjust enrichment. As the parties note, unjust enrichment is an equitable doctrine that requires a fact-intensive determination by the Court. *Young v. Fontenot*, 888 S.W.2d 238, 242-43 (Tex. App.–El Paso 1994, writ denied) (The form of a constructive trust, an equitable remedy to prevent unjust enrichment, is "practically without limit, *and its existence depends upon the circumstances*.") (emphasis added); *Austin Lakes Estates, Inc. v. Meyer*, 557 S.W.2d 380, 382-83 (Tex. Civ. App.–Austin 1977, no writ) ("Constructive trusts, being remedial in character, have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice."); *Brupbacher v. Raneri*, No. CIV.A. 3:98-CV-1174, 2000 WL 665560 at *4 (N.D. Tex. Mar. 17, 2000) ("When the *proven* (continued...)

The Court has considered AIG's other arguments on this issue and finds them unpersuasive. Therefore, AIG's motion to dismiss is granted without prejudice to Plaintiff Sims Estate's right to replead. If the Sims Estate intends to pursue its claims against AIG, the Sims Estate shall file a Third Amended Complaint within ten (10) business days of entry of this Opinion.[141]

## VI.   CAMELOT-RELATED CONTENTIONS

### A.   Ripeness

The Camelot Plaintiffs seek a declaratory judgment that (i) the Camelot Defendants never have had an insurable interest in the lives of the Camelot Plaintiffs, (ii) the Employer Defendants are not the legal owners of the COLI policies on the Camelot Plaintiffs' lives, and (iii) under Texas law, the employees are the "lawful owners" of the COLI policies, with all rights of the "owner" as defined in the policies. The Camelot Plaintiffs also seek a judicial determination of the value of a constructive trust and damages arising from Defendants' wrongs.

---

[140]  (...continued)

*circumstances* show that the holder of the legal title may not in good conscience retain the beneficial interest, then equity converts him into a trustee.") (emphasis added).

The Sims Estate argues that its unjust enrichment claim is based on AIG's participation in the COLI policy "scheme," which allegedly was inequitable because both the Wal-Mart and AIG profited from the policy on Sims's life. In particular, the Sims Estate contends that it seeks whatever money Wal-Mart paid to AIG in satisfaction of loans that AIG made to cover Wal-Mart's premium payments on the Sims Policy. AIG responds that it was not unjustly enriched as a result of these transactions. The Court cannot at this stage of the case make a determination on the particulars of the Sims Estate's claim that AIG was inequitably "enriched" or that the monies it received were "unjust." Nevertheless, the parties are directed to the Court's analysis of similar claims apparently asserted by the Camelot Plaintiffs.

[141]  Understandably, AIG has not sought dismissal of the Complaint as to the putative claims of other members of the proposed Plaintiff class. Thus, the Court does not determine AIG's status vis à vis the unnamed members of any such class. Such a final determination must await resolution of the claims against Employer Defendants, if any, to whom AIG sold COLI policies on the lives of Texas insureds.

The Camelot Defendants and Hartford strenuously argue that Plaintiffs' claims are not ripe and thus not justiciable.[142] For the reasons explained below, the Court holds that the Camelot Plaintiffs' claims are ripe for adjudication.

### 1. Declaratory Judgment Standards and the Ripeness Doctrine

In support of their request for a declaratory judgment, Plaintiffs rely on 28 U.S.C. § 2201(a), which provides in pertinent part: "In the case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Parties may seek declaratory judgment before a completed "injury-in-fact" has occurred. *United Transportation Union*, 205 F.3d at 857.

Nevertheless, to be ripe, a declaratory judgment claim must be based upon an "actual controversy. *Id.*; *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000).[143] An "actual controversy exists where 'a substantial controversy of sufficient immediacy and reality [exists] between parties having adverse legal interests.'" *Id.* (citation omitted). "A court should dismiss a case for lack of ripeness when the case is abstract or hypothetical." *New Orleans Public Service, Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987); *Orix Credit*, 212 F.3d at 895-96; *United Transportation Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000).

---

[142]  The Camelot Defendants initially filed a motion to dismiss on the ripeness issue. Thereafter, they and Hartford filed motions for summary judgment on the matter. *See* Camelot Defendants' Motion to Dismiss [Doc. # 15]; Camelot Defendants' Summary Judgment Motion [Doc. # 30]; Hartford's Summary Judgment Motion [Doc. # 24]. At the January 11, 2002 hearing, the Court converted the motion to dismiss to a motion for summary judgment since matters outside the pleadings had been presented by the parties. The Camelot Defendants and Hartford also raise ripeness as an issue in their oppositions to the Camelot Plaintiffs' Summary Judgment Motion. *See* Docs. # 39, 40, 54 and 55.

[143]  The court also "must resolve whether it has the 'authority' to grant declaratory relief in the case presented." *Orix Credit*, 212 F.3d at 895. This element is not an issue here. Further, "the court has to determine how to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Id.*

"The [ripeness] key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'. . . A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *New Orleans Pub. Serv., Inc.*, 833 F.2d at 586-87 (citations omitted) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *modified on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)); *accord Groome Resources Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000).

## 2. Defendants' Ripeness Arguments

All the Camelot Plaintiffs are alive. Under the express terms of the COLI policies, the Employer Defendants are allowed to change the named beneficiaries or to surrender the policies while the insureds, Plaintiffs, are alive. Defendants accordingly argue that the Camelot Plaintiffs' claims are too contingent to be ripe. Defendants argue that there "is no justiciable controversy . . . because any 'rights' that [Camelot Plaintiffs'] estates may be entitled to in the future depend on events which have not occurred and, in some cases, likely never will occur." Camelot Defendants' Motion to Dismiss, at 12.

The Court must consider each cause of action specifically asserted by the Camelot Plaintiffs to determine whether there is an actual controversy on that claim. Defendants' contentions fail to appreciate these Plaintiffs' first two fundamental claims for relief, namely, a request for a declaration that the Employer Defendants now lack (and in the past, lacked) an insurable interest in Plaintiffs' lives, and that the Employer Defendants are not (and have not been) the lawful owners of the COLI policies. The fact that the Employer Defendants may someday decide to surrender a policy or that these Defendants may change the beneficiaries in the future does not resolve the ripeness issues as to the Camelot Plaintiffs' claims, which challenge present circumstances. As discussed above, under the Texas insurable interest doctrine, only specified categories of people or entities may own insurance on another's life. Two public policy concerns underlie this doctrine: (i) the prevention of murder, and (ii) the prevention of wagering on human life. *E.g.*, *Stillwagoner*, 979 S.W.2d at 358. The Camelot Plaintiffs' claims raise the immediate

questions of whether the mere existence of the Camelot COLI policies violates Texas law, and whether the Employer Defendants are now the legal owners of the COLI policies on Plaintiffs' lives. Plaintiffs' claims thus satisfy the first of the Fifth Circuit's two ripeness factors, *i.e.*, that there is an actual controversy that is fit for judicial review. *See New Orleans Public Service*, 833 F.3d at 586-87.

As to the second ripeness factor, the Court finds that each Plaintiff would suffer hardship cognizable under Texas law, if a ruling in this case were delayed until that Plaintiff died. To withhold decision in a case would unnecessarily permit the potential violation to continue, thereby prolonging the very harms the insurable interest doctrine was designed to discourage, particularly the wagering on the insured's life. Thus, determination of the issue of whether the violation exists should not have to wait for the death of the insured. The insurable interest doctrine is prophylactic. There is no reason to delay a ruling on the declaratory relief Plaintiffs seek.

Defendants' opposition focuses on the 1951 decision of the Dallas Court of Civil Appeals in *Roberts v. Southwestern Life Ins. Co.*, 244 S.W.2d 302, 308 (Tex. Civ. App.–Dallas 1951, writ ref'd n.r.e.). In *Roberts*, the court held that T.P. Roberts, owner of several insurance policies, was estopped from asserting a right that he claimed under the Texas insurable interest doctrine to change the beneficiaries in life insurance policies without the consent of his former wife, Allene Roberts, one of the named beneficiaries on the policies. The *Roberts* court assumed for its ruling that Allene lacked an insurable interest in T.P.'s life after entry of their final divorce judgment. The *Roberts* court reasoned at several points in its opinion that T.P. was estopped from disturbing the final agreed divorce judgment entered years earlier by a court of competent jurisdiction, both because that judgment was final and because the judgment was based on the parties' agreed property settlement.[144] The court, at the end of the opinion, noted that a

---

[144] In *Roberts*, like many of the insurable interest cases, knowledge of the facts is pertinent to an understanding of the court's ruling. In that case, the issuer of a life insurance policy brought suit for a declaratory judgment to determine the rights of the living insured, his

(continued...)

determination of insurable interest in the case was not necessary until T.P. died, because the named beneficiaries might predecease T.P., thereby mooting the issues.[145]  *Id.* at 308-

---

[144]  (...continued)

former spouse, and their children in life insurance policies.  *Roberts*, 244 S.W.2d at 304. T.P. Roberts purchased several life insurance policies on his life.  *Id.*  T.P. and his spouse, Allene Roberts later separated, entered into a property settlement, and divorced.  *Id.*  The divorce decree, based on an agreed property settlement agreement, specified that Allene be substituted as the beneficiary in all life insurance policies on the life of T.P.  *Id.*  The divorce decree also declared that Allene had a continuing insurable interest in the life of T.P. because of the "fact that the premiums heretofore paid on the policies . . . were paid out of community funds, and for the reason that the parties in said agreement have bound themselves to pay equally the premium(s) on said policies as they mature."  *Id.* at 304-05.  Four years later, T.P. requested that the insurance company change the beneficiary to his personal representative, drawing a strong objection from Allene.  *Id.* at 305.  The insurance company brought suit to determine the rights of the parties.  *Id.*  T.P. argued that Allene did not then have an insurable interest in his life and that the property settlement was void.

The court assumed for the purpose of discussion that Allene did not have an insurable interest in the life of her former spouse.  *Id.* at 307.  The court nevertheless held that T.P.'s proper remedy was to have appealed the divorce decree directly, and not attempt a collateral attack on the judgment four years later.  *Id.*  The court concluded that it could not alter the final judgment of the divorce court.  *Id.* at 308.  In addition, the Dallas court held that T.P.'s acquiescence and consent to the divorce decree precluded him from arguing that the judgment was defective.  *Id.*  It also held that Texas courts refuse to permit him to reform the allegedly illegal agreement after he had intentionally agreed to it.  *Id.*

[145]  This final rationale by the *Roberts* court, the one rationale on which the Camelot Defendants rely, followed the court's further repetition that T.P. was barred by an estoppel.  The court stated:

It follows that [T.P.] Roberts is effectually estopped from asserting any right to change of beneficiaries named in this policies except in accordance with their terms, i.e., by consent of Allene Roberts if living, otherwise by consent of the Daughter Flora; his said rights therein having been made wholly subject to the . . . aforesaid judgment.  Further . . ., the questions herein propounded do not require a present determination. . . . 'the courts will not render a declaratory judgment as to future rights, but just as in ordinary actions will wait until the event giving rise to the rights has happened, or, in other words, until the rights have become fixed under an existing state of facts.' 16 Am. Jur., sec. 18, p. 292.  In major respects, a policy of insurance, like a will, speaks at time of death.

(continued...)

09. The *Roberts* decision is *sui generis*. The language on which Defendants rely was arguably *dicta*, and certainly was language designed merely to bolster an already clear and well supported result.

The precedential value of these comments by the *Roberts* court is sharply limited by the unique circumstances before that court. In any event, the *Roberts* ripeness ruling has been severely undermined by the Texas Supreme Court's decision in *Empire Life Ins. Co. v. Moody*, 584 S.W.2d 855 (Tex. 1979).[146] In that case, the Supreme Court directed the lower courts to determine an insurable interest issue, at the request of the insured prior to his death.[147] The *Empire* court thus recognized that the insurable interest issue was ripe

---

[145] (...continued)
*Id.* Pursuant to these principles, the court held that it is more appropriate to determine whether Allene Roberts had an insurable interest in the life of T.P. Roberts by virtue of "her asserted debtor-creditor relationship" at the time of T.P. Roberts's death. *Id.* 308-09.

[146] No Texas court has adopted the *Roberts* court's reasoning on the ripeness issue except *Moody v. Empire Life Ins. Co.*, 570 S.W.2d 450 (Tex. Civ. App.–Eastland 1978), which was reversed by the Texas Supreme Court, as noted in the text that follows.

[147] In *Empire*, an insured, Shearn Moody, Jr., brought a declaratory judgment for the purpose of invalidating an assignment of the right to an insurance policy on his life, contending that the assignee did not have an insurable interest in his life. *Id.* at 857. Moody, the principal stockholder, chief executive officer, president, and chairman of the board of Empire Life Insurance Company ("Empire"), assigned to the company his life interest in certain trust assets. *Id.* at 856. Empire was required by accounting rules to obtain a life insurance policy on Moody to cover the value of his life interest in the trust assets because the income from the trust would necessarily terminate upon Moody's death. *Id.* Thereafter, Empire experienced financial difficulties and was placed in receivership. *Id.* at 857. A deal was made whereby another insurance company, Protective Life Insurance Company of Birmingham, Alabama ("Protective"), took an assignment of some of Empire's policies in exchange for certain Empire assets, including Moody's trust income and insurance on Moody's life. *Id.* at 857-58. Moody later instituted an action seeking a judicial declaration that Protective had no insurable interest in his life. *Id.* at 857.

The trial court held that Protective did have an insurable interest in Moody's life, but the court of civil appeals, *sua sponte*, in part relying on *Roberts*, overturned that decision and held that the case was not ripe. *Id.* at 858. The Supreme Court of Texas reversed the court of appeals, ruled that the case was justiciable, and reinstated the trial court's decision. *Id.* The Supreme Court recognized that if the assignee, Protective, lacked an insurable interest,
(continued...)

for adjudication. *Empire*, 584 S.W.2d at 858. The *Roberts* ruling is limited to the unique facts of that case, and is not a persuasive precedent on the ripeness issue presented here.[148]

The Court concludes that, under Texas law, Plaintiffs' insurable interest claims are ripe and justiciable during their lives. If Plaintiffs' claims are valid, then there is no reason to allow improper insurance contracts to continue without judicial declaration of the parties' rights. The Court therefore holds that there is a present and actual controversy raised by the Camelot Plaintiffs in this case, and their claims are ripe for adjudication.

## B.    The Merits of Camelot Plaintiffs' Claims for Relief

The Camelot Plaintiffs have moved for summary judgment on their request for a declaration that the Camelot Defendants have no insurable interest in their lives.[149] The Camelot Defendants and Defendant Hartford move for summary judgment dismissing the Camelot Plaintiffs claims as a matter of law.[150] After careful consideration of the parties' submissions, the record, and the applicable authority, the Court grants the Camelot Plaintiffs' motion. The Court denies in part and grants in part the Camelot Defendants' and Hartford's summary judgment motions on these matters.

---

[147]    (...continued)
then Protective would be left with no income to satisfy the assignor, Empire's, obligations after Moody died, and Protective could not list the value of the Moody trust income as an asset, since Moody's trust payments could cease at any time. *Id.* at 858-59.

[148]    It is noted also that the vitality of the *Roberts* court's conclusion that the insurable interest issue was not ripe for declaratory relief is undercut by the fact that the court disapproved of the insurable interest doctrine, which it discussed at length in a footnote. 244 S.W.2d at 307 n.2. The court characterized the Texas insurable interest doctrine as "unsound" in light of certain statutory changes that were made to the doctrine which exempted fraternal societies. *Id.* The *Roberts* court's view has not prevailed. Fifty years later, the insurable interest doctrine remains strong as the law of Texas.

[149]    *See* Camelot Plaintiffs' Summary Judgment Motion [Doc. # 30].

[150]    *See* Camelot Defendants' Motion to Dismiss [Doc. # 15]; Hartford's Summary Judgment Motion [Doc. # 24].

1. **Camelot Plaintiffs' Claim for Declaration that Camelot Defendants Lack an Insurable Interest**

The Camelot Plaintiffs claim that the Camelot Defendants lack an insurable interest in the Camelot Plaintiffs' lives. These Plaintiffs argue that Texas law recognizes three forms of insurable interest: the beneficiary must be (i) related by blood or affinity, (ii) a creditor for the insured, (iii) or "one having a reasonable expectation of pecuniary benefit or advantage from the continued life of another." *Drane*, 161 S.W.2d at 1058-59.[151] It is undisputed that the first two categories are inapplicable to this case. The Camelot Plaintiffs argue that the third category also does not apply in this case.[152]

The Camelot Plaintiffs are correct. The Camelot Defendants fail to demonstrate that they presently have any expectation of pecuniary benefits or advantage from Camelot Plaintiffs apart from the COLI policies on these Plaintiffs' lives. Each Camelot Plaintiff's employment with the Camelot Defendants terminated in or prior to 1998.[153]

---

[151] Courts consistently refer to these categories of insurable interests. *E.g.*, *DeLeon*, 259 F.3d at 349-50 (citing *Drane*, 161 S.W.2d at 1058-59); *Stillwagoner*, 979 S.W.2d at 361 (describing *Drane* as the "most cited Texas definition of an insurable interest in another's life"); *Tamez*, 999 S.W.2d at 17 (quoting *Drane*).

[152] The court in *Drane* described the third category as follows:

> Bluntly expressed, insurable interest under [the third] classification, is determined by monetary considerations, viewed from the standpoint of the beneficiary. Would he regard himself as better off from the standpoint of money, would he enjoy more substantial economic returns should the insured continue to live; or would he have more, in the form of the proceeds of the policy should he die.

*Drane*, 161 S.W.2d at 1059. If the beneficiary "would profit by [the insured's] death, the policy contract is void as to [the beneficiary] since the public has a controlling concern that no person have an interest that may give rise to a temptation to destroy [the insured's] life." *Id.*

[153] *See* Complaint, at 5-6. It is noted that when Trans World bought Camelot, all Camelot's employees began to work for Trans World, which operates retails stores nationwide. Currently, Trans World operates 984 stores in 46 states and employs 10,000 people. Camelot Defendants' Motion to Dismiss, at 4. Camelot purchased COLI policies on 1430 of its

(continued...)

Thus, at the present time the Camelot Defendants have *no* relationship with the Camelot Plaintiffs outside the COLI policies.

In response to the Camelot Plaintiffs' motion, Hartford contends that it needs a continuance under Rule 56(f) of the Federal Rules of Civil Procedure to allow for discovery to determine whether the "key man" concept applies.[154] The Court denies this request since Hartford has failed to meet its burden to show entitlement to such delay.

"In order to obtain a continuance of a motion for summary judgment for discovery purposes, a party must set forth some statement to the court indicating why additional discovery is necessary and 'how additional discovery will create a genuine issue of material fact.'" *Canady v. Bossier Parish School Bd.*, 240 F.3d 437, 445 (5th Cir. 2001) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 28 F.3d 1388, 1395 (5th Cir. 1994)); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 535 (5th Cir. 1999). A party "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993) (internal citations omitted). Contrary to these legal requirements, Hartford has provided nothing except a vague suggestion that there may be a "key man" issue.

Texas law provides, by statute, that businesses may have an insurable interest in their "key" personnel, *i.e.*, important officers and stockholders. *See, e.g., Stillwagoner*, 979 S.W.2d at 361. The statute has been interpreted narrowly to grant an insurable interest "only to the lives of officers and stockholders 'to whom the other stockholders looked primarily for the success of the business' or 'on whose services the corporation depends for its prosperity, and whose death will be the cause of a substantial loss to it.'" *Id.* (quoting *McBride v. Clayton*, 166 S.W.2d 125, 128-29 (Tex. 1942)). The "mere

---

[153]    (...continued)
employees. Camelot Defendants' Motion to Dismiss, at 4.

[154]    *See* Hartford Life Insurance Company's Response to Camelot Plaintiffs' Motion for Partial Summary Judgment [Doc. # 39], at 5-6 n.4. The Camelot Defendants do not join Hartford in this motion.

existence of an employer/employee relationship is never sufficient to give the employer an insurable interest in the life of the employee." *Id.* No insurable interest exists if the loss arises *"from the cessation of ordinary service." McBride,* 166 S.W.2d at 129 (emphasis in original). In any event, once a "key man" leaves the company's employ, the need for "key man" insurance disappears. *See Cheeves,* 28 S.W. at 276 ("The want of an insurable interest is just as absolute where it has ceased as where it never existed, and the inducement to destroy the life insured for gain is just as strong in the one case as in the other.").

Hartford has failed to identify any specific individual to whom the "key man" concept might apply. Hartford has known the identity of the named Plaintiffs for a substantial period of time and has had continuous access to its own records on these individuals.[155] Hartford issued insurance on the lives of *1430* Camelot employees, who were retail store managers or district supervisors. There is no indication that any of the named Plaintiffs, or any of the insureds, fits the stringent Texas "key man" requirements. Thus, Hartford has failed to meet its Rule 56(f) burden to entitle it to a continuance or discovery.

The Camelot Defendants and Hartford also fail to meet their nonmovant summary judgment burden to raise a fact issue that any Camelot Plaintiff is or was a "key man" with the Camelot Defendants.[156] Thus, the Court holds that the Camelot Defendants currently lack, and have lacked in the past, an insurable interest in the Camelot Plaintiffs' lives.

---

[155] Hartford and the Camelot Defendants appear to have closely coordinated their defenses to this action, but Hartford fails to explain why the requested information, at least on the four Camelot Plaintiffs, was not easily available from the Camelot Defendants. It is noted that the Camelot Defendants did *not* join in this aspect of Hartford's motions.

[156] These Defendants also fail to demonstrate that dismissal of this claim is warranted.

The Camelot Defendants and Hartford, apparently recognizing the uphill battle they face in light of Texas law on this point, assert several dubious arguments. The Court discusses each below.[157]

Hartford contends, expressly contrary to Texas law,[158] that Plaintiffs lack standing to assert their claims because only insurers may state a claim for a lack of insurable interest. Hartford urges the Court to adopt the law of other states, since "Texas law on this subject is the anomaly, not the rule."[159] The Court is bound to apply Texas law for the reasons set forth in detail in prior sections of this Opinion. Accordingly, this argument is rejected.

Hartford further argues that the Camelot Plaintiffs are required under Texas law to show that Defendants have no insurable interest in their lives both at the time the policy was issued *and* at the time Plaintiffs' die.[160] Hartford's premise is based solely on a misconstruction of the two citations it provides. *See Insurance Contracts and Coverage*, 45 TEX. JUR. 3D § 217 (1995); *Roberts v. Southwestern Life Ins. Co.*, 244 S.W.2d 302, 308 (Tex. Civ. App.–Dallas 1951, writ ref'd n.r.e.)

Hartford relies on the sentence in *Roberts* that: "In major respects, a policy of insurance, like a will, speaks at the time of death." *Id.* at 308. The Court has already addressed *Roberts* above, finding it inapplicable to this case and undermined, if not

---

[157]   These Defendants also contend that Georgia law applies to this action and that Plaintiffs' claims are not ripe. The Court has already addressed and rejected these arguments.

[158]   Hartford cites *Tamez*, 999 S.W.2d at 15, for the proposition that a majority of state courts have held that only the insurer may raise the issue of insurable interest. Indeed, the court in *Tamez* explicitly rejected the rule in other states as "inequitable." *Id.* ("Once the policy has issued and the premiums have been paid, it would be inequitable for an insurer, at that late date, to attempt to escape its contract by claiming the beneficiary had no insurable interest.").

[159]   Hartford Life Insurance Company's Response to Camelot Plaintiffs' Motion for Partial Summary Judgment [Doc. # 39], at 17.

[160]   Hartford asserts that (i) Plaintiffs have failed to meet their summary judgment burden regarding the lack of an insurable interest at the time the policies were issued, and (ii) that it is impossible to know whether Defendants will have an insurable interest in Plaintiffs' lives when they die.

overruled in this respect, by the Texas Supreme Court in *Empire Life Ins. Co. v. Moody*, 584 S.W.2d 855, 858 (Tex. 1979). More importantly for present purposes, the quote on which Hartford relies does not address the issue at bar. *Roberts* contains nothing to support Hartford's argument.

The Texas treatise cited by Hartford merely sets forth the rule applied by Texas courts in determining who is entitled to death benefits when the benefits become payable. This rule is that the "beneficiary must have an insurable interest both at the time when the policy is issued and when the benefits are payable." *Insurance Contracts and Coverage*, 45 TEX. JUR. 3D § 217 (1995).[161] This well established principle means that if the named beneficiary lacks an insurable interest at either time, that beneficiary may not retain the death benefits from the life insurance policy. Hartford attempts to create a new rule. Hartford contends that Plaintiffs, because they are alive, cannot show that the Camelot Defendants lack an insurable interest because Plaintiffs cannot negate the existence of an insurable interest at the second of the two required points in time, *i.e.*, when Plaintiffs die. Hartford's argument amounts to the proposition that the existence or absence of the insurable interest during the insured's life is immaterial. This argument falls of its own weight. First, under black letter Texas law, the absence of an insurable interest at *either* pertinent time requires denial of the death benefits. In this case, the Camelot Defendants

---

[161]    The prologue to § 217, entitled "National Background," states:

> Generally, an insurable interest *at the inception* of a contract of life insurance is regarded as sufficient, and it is immaterial that such interest ceases prior to the death of the insured, *in the absence of* a provision in the contract or *a statute to the contrary* . . . . *In Texas, however, the beneficiary must also have an insurable interest when the benefits are payable.*

*Insurance Contracts and Coverage*, 45 TEX. JUR. 3D § 217 (emphasis added). Hartford's argument simply ignores pertinent parts of the treatise's analysis. Moreover, there is ample support in Texas law for the rule as fully explained in the treatise. *E.g.*, *Cheeves*, 28 S.W. at 276 ("The want of insurable interest is just as absolute where it has ceased as where it never existed, and the inducement to destroy the life insured for gain is just as strong in the one case as in the other."); *Cole v. Browning*, 187 S.W.2d at 594 (divorce decree terminates the insurable interest that the former spouses had in each other's lives).

cannot qualify for the death benefits on the Camelot Plaintiffs since Defendants lacked an insurable interest when the COLI policies were created.      Second, Hartford's reliance on the cited treatise is misplaced since that provision is relevant only to the award of death benefits, which are payable only after the insured dies. The Camelot Plaintiffs do not seek payment of death benefits at this time. Plaintiffs seek a declaration that the Camelot Defendants do not now have an insurable interest in their lives. The inquiry about the existence of an insurable interest at an insured's death in the future is separate from the determination of a beneficiary's *present* insurable interest on the insured while alive.

Hartford's argument, on close analysis, is essentially a reworked ripeness argument. As the Court held in the preceding section of this Opinion, the Camelot Plaintiffs' claim for a declaration as to the existence of a current insurable interest is ripe, and the Camelot Plaintiffs are entitled at this time to seek a ruling in this case as to whether the Camelot Defendants have a legally cognizable insurable interest.

Hartford and the Camelot Defendants have failed to raise a genuine fact issue in response to the Camelot Plaintiffs' motion seeking a declaration that the Camelot Defendants lack an insurable interest in Plaintiffs' lives. Therefore, the Camelot Plaintiffs' prayer for a declaration that the Camelot Defendants lack an insurable interest in the Camelot Plaintiffs' lives is granted. The Hartford and Camelot Defendants' motions for summary judgment to dismiss this claim are denied.[162]

---

[162]    The implication of the Court's ruling, of course, is that the Camelot Defendants cannot retain death benefits from the COLI policies, should any such benefits be paid to these Defendants at a time that they lack an insurable interest in the life of an insured. The Court specifically declines to reach other aspects of the parties' dispute in connection with death benefits from the COLI policies until the issues become ripe. For instance, no party has sought a ruling on, and thus the Court does not determine, who should bear responsibility for the policy premiums (if any) paid by the Camelot Defendants to purchase the Sims Policy. A further issue is whether the insured's estate receives the death benefits without reduction for interest charges imposed by Hartford on the premiums due from the Camelot Defendants.

### 2. Camelot Plaintiffs' Claim for a Constructive Trust and Ownership of the COLI Policies

In the Complaint, Plaintiffs seek a declaration that they are the owners of all existing COLI policies on their lives.[163]   Plaintiffs further seek a "final judgment concluding that the policies, policy benefits, and any residual or resulting benefits from the policies are held in a constructive trust by [Defendants]." Complaint, at 12. The Camelot Defendants and Hartford move to dismiss these claims.[164]   The Court grants these aspects of Defendants' motions.[165]   These rulings are made in the context that no Camelot Plaintiff has died, and there are no death benefits due at this time.

***COLI Policy Proceeds Upon a Plaintiff's Death.***– Courts applying the Texas insurable interest doctrine consistently have held, in the event that the beneficiary lacks an insurable interest, that the insurance policy is to be enforced as written except that a constructive trust is imposed in favor of the insured's estate on the death benefits that are paid.[166]   In most reported cases, the insured has died.[167]   The insurable interest doctrine,

---

[163]   Specifically, Plaintiffs seek declarations both that the Defendants are not the lawful owners of the COLI policies and that Plaintiffs *are* the lawful owners.

[164]   *See* Camelot Defendants' Motion to Dismiss [Doc. # 15]; Hartford's Summary Judgment Motion [Doc. # 24].

[165]   This holding is distinct from the Court's ruling on the Sims Estate's claim for death benefits received by Wal-Mart.

[166]   The Texas Supreme Court in *Cheeves*, 28 S.W. at 275 that:

> When an insurance company has issued a policy upon the life of a person, payable to one who has no insurable interest in the life insured, or when a policy has been assigned to one having no such interest, the insurance company must nevertheless pay the full amount of the policy, if otherwise liable, because it has so contracted; and it is no concern of the insurer as to who gets the proceeds, *except to see that it is paid to the proper parties, under its agreement. It is simply required to perform its contract, and the law will dispose of the money according to the rights of the parties.*

> *Cheeves*, 28 S.W. at 275 (emphasis added). In the century that has followed *Cheeves*, Texas courts have held time and again that the insurance contract is to be performed as written.
> (continued...)

therefore precludes the Camelot Defendants from retaining death benefits from a COLI policy on the life of a Camelot Plaintiff, *if* the COLI policy is still owned by the Camelot Defendants at the time the Camelot Plaintiff insured dies and *if,* at that time, the policy designates a Camelot Defendant as the beneficiary. *See, e.g., Insurance Contracts and Coverage*, 45 TEX. JUR. 3D § 217 (1995). However, for the reasons explained below, Texas law does not justify declaration of an immediate constructive trust on contingent death benefits or other rights under the policy while the insured is still alive.

*Living Plaintiffs' Remedies.*– The Camelot Plaintiffs, the living insureds under COLI policies, seek to obtain ownership of the insurance policies *per se*, as well as a judgment imposing a constructive trust on "the policies, policy benefits, and any residual or resulting benefits from the policies."[168]  Each Plaintiff thus seeks control over the policy on his own life, as well as all benefits available to the owner under the policy

---

[166]  (...continued)
*E.g., Wilke v. Finn*, 39 S.W.2d 836, 839 (Tex. Comm'n App. 1931, judgm't adopted) (quoting *Cheeves*, 28 S.W. at 275); *Stillwagoner*, 979 S.W.2d at 358 ("[A]lthough the Texas rule requires the designated beneficiary to have an insurable interest, it is not essential to the validity of the contract."); *DeLeon*, 259 F.3d at 353 (holding that insurable interest doctrine does not entitle deceased insured's estate to a reformation of the insurance contract, but a constructive trust on the policy proceeds).

[167]  In *Wilke v. Finn*, 39 S.W.2d 836 (Tex. Comm'n App. 1931, judgm't adopted), the Texas Commission on Appeals discussed the available remedy for insurable interest cases:

> [A] person designated in the policy as the beneficiary, [may be treated], when he has no insurable interest, as an assignee, appointee, or trustee, to receive the proceeds for whoever may be lawfully entitled to enjoy them. The insurer will then be required to pay the sum it has promised to pay, and the money cannot be appropriated by anybody not having a legitimate right to it.

*Wilke v. Finn*, 39 S.W.2d at 838 (quoting *Equitable Life Ins. Co. v. Hazlewood*, 12 S.W. 621, 625 (Tex. 1889)). Various recent decisions, discussed elsewhere in this Opinion, follow these principles.

[168]  Plaintiffs, by implication, therefore also appear to seek recovery of the surrender value of the policies should the Camelot Defendants choose to terminate the policies.

during Plaintiff's lifetime and thereafter.[169]   Plaintiffs' request for an immediate constructive trust on the COLI policies would require Defendants to handle the policies as fiduciaries, giving Plaintiffs substantial authority over the disposition of the policies and their proceeds.  Establishment of constructive trusts during Plaintiffs' lives, as Plaintiffs request, would be analogous to transfer of ownership of the policies to Plaintiffs. Therefore, the Court will address Plaintiffs' claims for ownership and for a constructive trust together.

After considering the parties' arguments and the authorities applying the insurable interest doctrine, the Court finds no probative support in Texas law for the far-reaching remedies Plaintiffs request.  The Camelot Plaintiffs attempt to obtain remedies well beyond relief any Texas court previously has ordered under the insurable interest doctrine in circumstances even remotely similar to those here.  The Court declines this invitation. The Court concludes that Texas courts would not provide for the transfer of legal or beneficial ownership of the COLI policies during the insured's lifetime to remedy a violation of the insurable interest doctrine.

The Fifth Circuit recently addressed the remedies available under the insurable interest doctrine in *DeLeon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344 (5th Cir. 2001).  The Court was faced with claims of a deceased insured's estate, and not, as in the instant case, the claims of living insureds.  Nevertheless, the *DeLeon* opinion is instructive.

In *DeLeon*, the estate of a deceased insured brought suit against the insurer that had issued an "accidental death" life insurance policy to the insured's employer.  *Id.* at 346.  The employer was the beneficiary and owner of the policy.  The employer had purchased the policy in lieu of participation in the worker's compensation program.  The insured died in the course of employment, and the insurer paid death benefits to the employer.  The insured's estate sued the employer in state court.  Those parties settled;

---

[169]   As a practical matter, the Camelot Plaintiffs' requested relief is likely to require transfer of ownership of thousands of insurance policies to Plaintiff insureds.

the employer compensated the estate in exchange for a comprehensive release from liability. *Id.* at 347. At the time it settled with the employer, the estate was unaware of the existence of the employer-owned accidental death policy. After learning of the policy, the estate sued the insurer and the insurance broker. The insurer asserted a third-party claim against the employer. Ultimately the case proceeded in federal court on only the claims of the estate against the insurer. *Id.*

The estate in *DeLeon* sought to reform the insurance contract to name itself as the lawful beneficiary of the policy.[170] 259 F.3d at 350. The district court granted summary judgment to the insurer. *Id.* at 347. The court of appeals held that (i) the employer did not have an insurable interest in the insured's life and (ii) the employer held the policy proceeds, which the insurer previously had paid to the employer, in constructive trust for the benefit of the estate. *Id.* at 349. The court of appeals, however, refused to reform the insurance contract to substitute the estate as beneficiary. *Id.* at 353.

In reaching its decision, the Fifth Circuit recognized the traditional remedy under the insurable interest doctrine was to create a constructive trust on the policy proceeds consisting of the death benefits. *Id.* at 350-51.[171] The court of appeals noted that the

---

[170] *DeLeon* was a case related to, and partly controlled by, *Tamez*, 999 S.W.2d at 16-17, 19, which was a suit brought by other employee-insureds against the same employer concerning the same accidental life insurance. The Houston court of appeals in *Tamez* held that there was no contractual relationship between the plaintiff estates and the insurer. *Id.* at 21. Thus, that court ruled that the *Tamez* plaintiff estates in *Tamez* lacked privity with the insurer to seek policy benefits under the terms of the policies. In *DeLeon*, the Fifth Circuit held that the rulings in *Tamez* collaterally estopped the parties from relitigating certain issues. Also, in *DeLeon*, the estate had released the employer from all further responsibility. Accordingly, the DeLeon estate sought reformation of the insurance contract in the hopes of obtaining policy benefits directly from the insurers.

[171] "Where an insurer pays the proceeds of a policy to a beneficiary having no insurable interest, Texas courts have consistently held that a constructive trust is the appropriate remedy." *Id.* at 350. The court of appeals explained that the purpose of the rule requiring the insurance contracts to be enforced as written is to avoid a "windfall to insurers at the expense of lawful beneficiaries." *Id.* Texas courts "require the insurer to pay the policy proceeds to the beneficiary named in the policy." *Id.* If the beneficiary does not have an insurable interest, the beneficiary will hold the proceeds in a constructive trust for the benefit of the insured's
(continued...)

purpose of the insurable interest doctrine is *not* to impose a penalty on the insurer, and held that the traditional remedy was sufficient to vindicate the insurable interest doctrine. *Id.* at 351.[172]

Plaintiffs here seek the transfer of legal and beneficial ownership of insurance policies to themselves. This prayer amounts to a request for reformation of the insurance contract, a remedy the *DeLeon* court specifically denied. This Court similarly is refuses to grant reformation of the COLI policy contracts. This extraordinary relief is not necessary to vindicate the goals of the insurable interest doctrine for living Plaintiffs. Plaintiffs concede that they cite no cases granting the remedy of assignment to an insured of the ownership of a policy in circumstances remotely analogous to this case. The Court's declaration that the Camelot Defendants lack an insurable interest in the Camelot Plaintiffs' lives is sufficient to eliminate these Defendants' theoretical incentive to commit murder or to wager on the life of the insured. The remedial purpose of the insurable interest doctrine is satisfied by the Employer Defendants' knowledge that a constructive trust on death benefits will be imposed, if necessary, after an insured's death.

Plaintiffs resist this result, first, by arguing that it logically follows from the insurable interest doctrine that they are the "owners" of the COLI policies. Plaintiffs' argument appears to be that, first, Texas law forbids a person owning a life insurance policy without an insurable interest in the life of the insured; second, Texas law will not invalidate the insurance contract itself; and, therefore, the insured necessarily must become the owner of such a policy that continues to exist.[173] Plaintiffs' reasoning is

---

[171]     (...continued)
          estate. *Id.* at 350-51.

[172]     Certain equities in *DeLeon* supported this result. The estate already had settled with the employer and had executed a comprehensive release from liability. The employer also had received death benefits under the policy from the insurer. The Court expressed concern that the insurer not be subject to double liability on the policy both from the named beneficiary and from the insured's estate. *Id.*

[173]     Plaintiffs acknowledge that they would have to bear the responsibilities that ownership
                                                                              (continued...)

faulty. Plaintiffs assume that the Camelot COLI policies must continue in force as presently written. There is no reason, however, under the insurable interest doctrine that a COLI policy must continue in its present form. Any step that eliminates the improper incentives the insurable interest doctrine is designed to address is sufficient to satisfy Texas public policy. Subject to the written terms of each COLI policy, the owner may elect among various options: change the beneficiary to a person with an insurable interest[174]; change the insured so the owner obtains an insurable interest; surrender the policy; or merely let the policy lapse. The choice belongs to the owner of the contract, the Camelot Defendants. This Court sees no reason to interfere with these Defendants' decisions as to how the COLI policies' violations of Texas law should be corrected.

Plaintiffs next point out that various Texas courts have stated that "the public policy of this state forbids allowing one to own an insurance policy on the life of another in whom he has no insurable interest." *E.g.*, *Shoemaker*, 48 S.W.2d at 614. These types of comments, however, do not address the relief of imposition of an immediate constructive trust or transfer of ownership, as Plaintiffs seek. These comments simply establish that the violation must be cured. These courts give no indication that the insured, while alive, is entitled to a financial benefit from Defendants in the process of effecting the cure.

Plaintiffs also attempt to generalize from several appellate court rulings in divorce cases. Plaintiffs contend that "Texas courts have been called upon in other similar circumstances to adjust ownership rights under insurance policies while the insured

---

[173]    (...continued)
         entails.

[174]    Under the analysis in 45 TEX. JUR. 3d § 217, it is unclear whether any person other than one selected by the insured would qualify as a lawful beneficiary on the existing policies, if a Camelot Plaintiff remains the insured. However, this is a matter the Court need not and does not decide at this time.

person is living."[175]   Plaintiffs contend that the divorce cases provide more pertinent guidance than the *Stillwagoner*,[176] *Tamez*,[177] and *DeLeon*[178] line of cases, which Plaintiffs distinguish as involving deceased insureds who died without awareness of their employers' ownership of COLI policies on their lives.   Plaintiffs are correct that the *Stillwagoner* line of cases does not specifically address the rights of living insureds, and the divorce cases do.   However, the Court does not find the divorce cases persuasive authority for Plaintiffs' positions.   Indeed, these cases implicitly support the result reached by this Court.

Plaintiffs rely on the divorce cases to posit that Texas courts have approved practical solutions to solve insurable interest violations.   In these cases, the courts seek to compensate the former wife for her contribution during her marriage deemed made under community property laws in connection with premium payments for an insurance policy on the life of her husband.   *See Shoemaker v. Am. Nat'l Ins. Co.*, 48 S.W.2d 612, 613-14

---

[175]   Camelot Plaintiffs' Response to Camelot's Motion to Dismiss [Doc. # 28], at 8.

[176]   In *Stillwagoner*, a Texas court of appeals addressed the issues of whether "the employer [and beneficiary of a life insurance policy] had an insurable interest in the life of the decedent, and who is entitled to raise the issue of lack of insurable interest." 979 S.W.2d at 356. The court held that the insured's estate had standing to raise the insurable interest issue and that the employer did not have an insurable interest in the life of the insured. *Id.* at 360, 363-64. In examining the insurable interest doctrine, the court emphasized that the insurance contract is to be performed as written, and the proceeds are paid to the designated beneficiary, who holds them in constructive trust. The court stated: "although the Texas rule requires the designated beneficiary to have an insurable interest, it is not essential to the validity of the contract." *Id.* at 358. "If insurance benefits are paid to a beneficiary without an insurable interest, the beneficiary holds the proceeds for the benefit of those entitled by law to receive them." *Id.*

[177]   The *Tamez* court held that the estates had standing to challenge the existence of an insurable interest and that the defendant employer did not have an insurable interest in the insured's lives. 999 S.W.2d at 14-15.

[178]   *See* the discussion of *DeLeon, supra,* in this Section.

(Tex. Comm'n App. 1932, jdgm't adopted)[179]; *Berdoll v. Berdoll*, 145 S.W.2d 227, 230-31 (Tex. Civ. App.–Austin 1940, writ dism'd).[180]  After a divorce, one former spouse has no insurable interest in the other spouse's life.  One former spouse named as the policy beneficiary may not receive death benefits post-divorce from an insurance policy on the other former spouse.  The *Berdoll* court held that one of the insurance policies in issue had to be surrendered for its cash value, which was to be paid to the former wife.  In *Shoemaker*, the court granted the beneficiary who lacked an insurable interest the choice of surrendering the policy and obtaining the surrender value during the insured's life. *Berdoll* and *Shoemaker* demonstrate that Texas courts will exercise equitable powers to grant a beneficiary without an insurable interest a right to the surrender value of the policy, essentially to reimburse that beneficiary for costs or monies deemed paid in connection with the purchase of the policy.  *E.g., Shoemaker*, 48 S.W.2d at 614. However, this result does not dictate the outcome for the Camelot Plaintiffs' claims. Texas courts have characterized the surrender value as a "debt against the insurance

---

[179]  In *Shoemaker*, the insured was still alive. The insured and his wife purchased an insurance policy on the husband's life during their marriage. When the couple divorced, the former wife remained the named beneficiary under the policy. The wife died, and the court held that her estate was entitled to the cash surrender value of the life insurance policy on her former husband. *Shoemaker*, 48 S.W.2d at 613-14.  The court distinguished between the death benefits and the surrender value. *Id.* at 614.  The court stated that the former wife did not have a right to the death benefits.  However, since her former husband was still alive, her estate could claim the surrender value of the policy, which the court characterized as "a debt against the insurance company." *Id.*

[180]  In *Berdoll*, the Texas appeals court adjusted the rights of married persons during divorce proceedings.  The court sought to ensure that each individual to the marriage received a fair portion of the couple's community property.  Shortly before he was married, A.J. Berdoll purchased life insurance policies on his life. *Berdoll*, 145 S.W.2d at 228-29.  After his marriage, A.J. named his wife, Annie Berdoll, as the beneficiary. *Id.*  Thereafter, premiums were paid out of the community funds of the couple. *Id.*  It was undisputed that Annie would no longer have an insurable interest in the life of A.J. after they divorced. *Id.* at 230. Accordingly, the trial court held, and the appeals court affirmed, an adjustment of the rights related to the insurance policies to reflect Annie's equitable share of the policies value. *Id.* Specifically, the court ordered that one of the policies be surrendered and the cash value paid to the former wife. *Id.*

company" that does not invoke the insurable interest doctrine. *Id.* In fact, contrary to Plaintiffs' position, the appeals court in *Shoemaker* found that an interest in the surrender value gives its holder an interest in preserving the life of the insured, at least until the holder can claim the surrender value. *Shoemaker*, 48 S.W.2d at 615. Plaintiffs' request for ownership of, or immediate constructive trust on, the Camelot COLI policies extends much farther than the remedies imposed in the cases on which Plaintiffs rely. *Berdoll* and *Shoemaker* therefore do not support Plaintiffs' requests for relief.

Plaintiffs also argue, this time without any viable legal support, that Texas law makes no meaningful distinction between ownership of policy benefits after death and the ownership of the policy during life, and that there is only a "technical distinction" between the remedy available to the Plaintiffs' estates upon their deaths and COLI policy ownership during Plaintiffs' lives. This argument is rejected. In the single case cited by Plaintiffs, *Little v. X-Pert Corp.*, 867 S.W.2d 15 (Tex. 1993), there was no issue of a lack of an insurable interest. *Id.* at 17.[181] In fact, the corporation that owned the policy

---

[181] *Little* is inapposite; the corporation in issue had an insurable interest. 867 S.W.2d at 17. The issue in *Little* was one of contract construction under very different circumstances from those at bar. In *Little*, four married couples, each of which owned twenty-five percent of the shares of a corporation, executed a "Buy-Sell" agreement. *Id.* at 15. The agreement provided that the corporation was to purchase life insurance on the lives of each of the husbands. *Id.* The corporation was named as the beneficiary and was responsible for making premium payments. *Id.* Upon any of the husband's deaths, the agreement provided that the surviving spouse would have to choose between retaining her twenty-five percent ownership interest in the corporation or accepting the death benefits from the policy. *Id.* at 15-16. Paragraph 10 of the agreement provided that if any of the shareholders sold their interest during their lifetime, the insureds would automatically obtain control over the life insurance policies on their lives. *Id.* One of the shareholders, James Little, sold his shares and died shortly thereafter. *Id.* at 16. Glee Little, James's wife, sought the policy proceeds from the corporation. *Id.* The corporation refused and brought suit against Glee for a declaratory judgment. *Id.* The parties moved for summary judgment. *Id.* The trial court granted the corporation's motion and held that the corporation can retain the proceeds from the policy, and the court of appeals affirmed. *Id.* at 16. Glee argued that, pursuant to Paragraph 10 of the agreement, her husband's estate was the owner of the policy and was entitled to the policy benefits from the corporation. *Id.* The court of appeals held that, while the husband's estate was the owner under Paragraph 10, he was required to take an affirmative step to claim the policy benefits. *Id.* The Supreme Court of Texas, viewing the matter as an issue of

(continued...)

indisputably had an insurable interest in the life of the insured even after he sold his shares in the corporation. *Id.* his case is patently inapplicable and Plaintiffs' argument is rejected.

Plaintiffs also invoke basic principles of equity to support their argument for ownership of or an immediate constructive trust on the COLI policies. Plaintiffs request that the Court exercise its inherent equitable powers to adjust globally the ownership rights of the COLI policies. Plaintiffs contend that they should recover financially from these policies (through the transfer of ownership or constructive control over the policies) because Defendants violated the law and Plaintiffs have been, and continue to be, at risk as insureds. This argument is unavailing. Plaintiffs contributed nothing of value for the COLI policies, unlike the former wives in *Berdoll* and *Shoemaker,* who under the Texas community property laws were deemed to have paid part of the premiums for the insurance on their former husbands' lives. Plaintiffs point to no physical or financial harm to themselves arising from the policies. It is the Camelot Plaintiffs who would receive a windfall if their requested relief were granted. The Camelot Plaintiffs' requests for ownership of or a constructive trust over the COLI policies are denied.

As the last arrow in their quiver, Plaintiffs seek to impose a constructive trust on all policy benefits, including the surrender value,[182] because, Defendants allegedly have been unjustly enriched by the COLI policies. Plaintiffs contend that Defendants exploited them for the purpose of Defendants' profits. Plaintiffs present no probative legal authority to support the relief sought. In Texas, a "party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi,*

---

[181]   (...continued)
contract construction, reversed holding that James's estate was entitled to the policy benefits. *Id.* at 18. Under these limited circumstances, the Supreme Court held that "it would be an anomaly to construe Paragraph 10 as automatically transferring ownership of the insurance policy but not the proceeds." *Id.*

[182]   Plaintiffs apparently seek the total surrender value of the COLI policies without deductions for the premiums paid by the Camelot Defendants or the interest on the associated loans.

832 S.W.2d 39, 41 (Tex. 1992); *Academy Corp. v. Interior Buildout & Turnkey Constr., Inc.*, 21 S.W.3d 732, 741 (Tex. App.–Houston [14th Dist.] 2000, n. pet. h.). "Unjust enrichment, however, is not a proper remedy merely because . . . the benefits to the person sought to be charged amount to a windfall." *Heldenfels*, 832 S.W.2d at 41-42; *Academy Corp.*, 21 S.W.3d at 741.

Plaintiffs essentially base their request for relief on the concept that the Camelot Defendants will experience a "windfall" if they are allowed to retain the surrender value. Plaintiffs also apparently contend that Hartford will obtain (and may have obtained already) an unjust benefit because the policies generate premiums and interest on the loans to cover the premiums. These matters are insufficient to justify equitable relief that grants Plaintiffs a financial windfall.

Furthermore, in seeking the surrender value, Plaintiffs essentially seek reformation of the insurance contracts so they become the owners. This result has been rejected repeatedly by Texas courts and the Fifth Circuit. The Texas insurable interest violation alone does not warrant reformation of the insurance contract. Plaintiffs' alternative relief, the imposition of a constructive trust during Plaintiffs' lives, would do largely the same thing. As a practical matter, the constructive trust is designed either to force the Camelot Defendants to surrender the policies and pay the Camelot Plaintiffs the surrender value, or to require these Defendants to maintain the policies until the Camelot Plaintiffs' deaths and then to pay the proceeds to Plaintiffs. The extreme remedy of a constructive trust over the COLI policies during Plaintiffs' lives is not necessary to correct the identified violations of Texas law. As noted previously, Plaintiffs have not shown they have suffered *any* financial or physical losses as a result of Defendants' actions. Hartford entered into private contracts for insurance with the Camelot Defendants. As among these parties, the Court will not interfere with these agreements. The workings of the premiums payments and loans to cover these costs do not directly involve Plaintiffs. Therefore, the Court holds that Plaintiffs may not recover a financial benefit through a

contract reformation or constructive trust that provides Plaintiffs the recovery of the policies' surrender values, *per se* or net of the related loans.

In sum, the Court is unpersuaded by the merits of Plaintiffs' equitable arguments. The Court therefore exercises its discretion to deny the novel, extraordinary remedies Plaintiffs request for Defendants' violations of the insurable interest doctrine. Under this doctrine, Plaintiffs' and the Court's only valid concern is to remove the incentive for Defendants to wager on or to take Plaintiffs' lives. This goal is accomplished by informing the parties now that the Camelot Defendants lack an insurable interest that allows them to retain COLI policy death benefits on Plaintiffs' lives. Defendants may not be innocent players in the drama they assisted in setting in motion. However, in the absence of any actual physical or economic harm suffered as a result of the policies, the Court sees no reason to impose unprecedented remedies.

Accordingly, the Court denies the Camelot Plaintiffs' request for ownership of the Camelot COLI polies on their lives, and denies these Plaintiffs' request for constructive trusts over the policies and the resulting rights and benefits. The Court grants Defendants' motions to dismiss the Camelot Plaintiffs' prayers for a declaration of ownership and for imposition of a constructive trust over the COLI policies during Plaintiffs' lifetimes.[183]

## VIII. CONCLUSION

After detailed consideration of the parties' myriad motions, the voluminous record, and all applicable authorities, the Court concludes the following:

The Texas law of insurable interest governs this case. The Court is convinced that a Texas courts would apply Texas insurable interest law to the COLI policies on Plaintiffs' lives.

---

[183]  The Court has considered Plaintiffs' remaining arguments regarding COLI policy ownership and finds them unpersuasive. They are rejected. Furthermore, Defendants have submitted supplemental material regarding how the COLI policy loans affect the surrender value of the COLI policies. *See* Repasy Aff. ¶ 3; Camelot Defendants' Supplement, at 1-3. Because the Court holds that the Plaintiffs are not entitled to the policies' surrender value, the Court need not examine this evidence.

Defendants' arguments for dismissal of the Sims Estate's claim are without legal merit. The Sims Estate's claim is not preempted by ERISA, as Wal-Mart has argued, because it does not relate to an ERISA plan. Further, the Sims Estate's claim was timely filed within the applicable four-year statute of limitations. Defendant AIG's motion for dismissal of the Sims Estate's claim against it is granted, but the Sims Estate is granted leave to replead if it deems necessary.

The Court denies in part and grants in part Defendants' motions to dismiss or for summary judgment on the Camelot Plaintiffs' claims. The Camelot Plaintiffs present a ripe and justiciable controversy. The insurable interest doctrine is a prophylactic rule intended to eliminate the incentive to wager on or take the life of another. The Camelot COLI policies on Plaintiffs' lives are still in effect and thus the Camelot Plaintiffs have an actual controversy with the Camelot Defendants.

On the merits of the Camelot Plaintiffs' declaratory judgment claim, the Camelot Defendants lack an insurable interest under Texas law in the death benefit from the COLI life insurance policies on Texas Plaintiffs' lives.

The Camelot Plaintiffs' requests for equitable relief are denied. Although the Camelot Defendants cannot retain any death benefits under the offending COLI policies, Texas law grants the remedy of a constructive trust on the policy benefits only at the insured's death, if the offending policy still exists in its current form at that time. The Camelot Plaintiffs' request to be declared the owners of the COLI policies in lieu of the Camelot Defendants and the Plaintiffs' request for reformation on the policies are unwarranted extensions of Texas law. The Camelot Defendants remain the owners of the COLI policies. Furthermore, Plaintiffs are not entitled to an immediate constructive trust covering the COLI policies on their lives, the death benefits, the surrender value or any other residual rights under these policies. It is therefore

**ORDERED** that the Motions of Defendants Camelot Music, Inc. and Trans World Entertainment Corp. to Dismiss the Complaint [Doc. # 15] and [Doc. # 36] are **GRANTED IN PART** and **DENIED IN PART with prejudice**. The Camelot

Plaintiffs' claims for ownership of, and for a constructive trust on, the Camelot COLI policies are **DISMISSED**. It is further

**ORDERED** that the Motion of Defendants' Camelot Music, Inc. and Trans World Entertainment Corporation for Summary Judgment [Doc. # 30] is **DENIED with prejudice**. It is further

**ORDERED** that the Camelot Plaintiffs' Motion for Partial Summary Judgment [Doc. # 17] is **GRANTED**. The Court **DECLARES** pursuant to 28 U.S.C. § 2201(a) that Defendants Camelot Music, Inc. and Trans World Entertainment Corporation lack an insurable interest in the lives of Plaintiffs Scott Mayo, Toribio Rochas, Jr., Tomas Pena, Daniel Garza, and Charles W. Holmes, Jr. It is further

**ORDERED** that the Defendant Wal-Mart's Motion for Summary Judgment and Brief in Support [Doc. # 19] is **DENIED with prejudice**. It is further

**ORDERED** that the Motion for Summary Judgment of Defendant Wal-Mart Stores, Inc. Corporation Grantor Trust, Through its Trustee, the Wachovia Bank of Georgia, N.A. [Doc. # 58] is **DENIED with prejudice**. It is further

**ORDERED** that Hartford Life Insurance Company's Motion for Summary Judgment [Doc. # 24] is **GRANTED IN PART** and **DENIED IN PART with prejudice**. It is further

**ORDERED** that Defendant AIG Life Insurance Company's Motion to Dismiss and Memorandum in Support Thereof [Doc. # 59] is **GRANTED without prejudice** to Plaintiff Sims Estate's filing a third amended complaint within ten (10) days from entry of this Order. It is further

**ORDERED** that Defendant AIG Life Insurance Company's Motion and Memorandum in Support of Summary Judgment on Plaintiffs' Second Amended Complaint [Doc. # 60] is **DENIED with prejudice**. It is further

**ORDERED** that Plaintiffs' requests pursuant to FED. R. CIV. P. 56(f) for continuance are **DENIED**. It is further

**ORDERED** that Defendant Wal-Mart's Objections to Declaration of Seth J. Chandler [Doc. # 56], Defendants Camelot Music, Inc. and Trans World Entertainment Corporation Motion to Strike the Declaration of Seth J. Chandler [Doc. # 54], and Hartford Life Insurance Company's Objection to the Declaration of Seth J. Chandler [Doc. # 55] each are **DENIED**. It is further

**ORDERED** that Hartford Life Insurance Company's request for a continuance pursuant to FED. R. CIV. P 56(f) is **DENIED**. It is further

**ORDERED** that Plaintiffs' Motion to Strike, Response to Wal-Mart's Supplemental Brief in Support of Motions for Summary Judgment, Supplemental Motion for Continuance and Leave to Depose Tom Emerick [Doc. # 85] and [Doc. # 91] is **DENIED**. It is further

**ORDERED** that Plaintiffs' Response to Camelot's and Hartford's Submissions Concerning Policy Loans, Motion for Continuance and Leave to Depose Christine Repasy or, in the Alternative, to Strike her Affidavit [Doc. # 86] is **DENIED**.

SIGNED at Houston, Texas, this 5th day of March, 2002.

NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE